# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

| | | |
|---|---|---|
| CHAMPION SALT, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. |
| | ) | |
| MARK J. ARTHOFER, SKYLINE | ) | |
| MIXING & SALES, LLC, SKYLINE | ) | |
| STORAGE & TRUCKING, INC., and | ) | |
| SKYLINE SALT SOLUTIONS, | ) | |
| | ) | |
| Defendants | ) | |
| | ) | |

## COMPLAINT

Plaintiff, Champion Salt, LLC (hereinafter "Champion"), states as follows for its Complaint against Defendants Mark J. Arthofer ("Arthofer"), Skyline Mixing & Sales, LLC ("Skyline"), Skyline Storage & Trucking, Inc. ("Skyline Storage"), and Skyline Salt Solutions (collectively, "Defendants"):

## PRELIMINARY STATEMENT

Champion is a supplier of superior treated and untreated bulk de-icing salt to snow and ice management contractors, municipalities, and distributors throughout the Midwest. Champion's customers rely on Champion to provide the high-quality salt they need for winter seasons. Skyline is in the business of treating salt and selling services to treat salt. To Champion's knowledge, prior to the performance of the Services Agreement described below, Defendants had no experience in the business of storing bulk salt at terminals, importing and piling bulk salt at terminals, operating terminal scale software for delivery of bulk salt by the truckload, or maintaining, tarping and selling bulk salt rom its own bulk salt inventory piles, in this fashion.

Defendant Skyline and its principal, Defendant Arthofer, contracted with Champion to provide certain sales and salt mixing services to Champion pursuant to a Services Agreement dated June 1, 2020.  During Spring 2021, Arthofer began aggressively seeking an equity ownership stake in Champion, despite Arthofer and Skyline performing poorly under the Services Agreement. While Champion repeatedly informed Arthofer that it would discuss with him the opportunity to obtain an equity stake in Champion following its reconciliation of the 2020-2021 business season, Arthofer refused to abide by the parties' timeline for considering him as an equity owner and informed Champion he was "moving on" on June 4, 2021.

Following Arthofer's decision to "move on", Champion reviewed Skyline's activity on Champion's internal customer relationship management ("CRM") software and discovered that despite Arthofer's representations that he wanted to become an equity owner of Champion, he was secretly downloading and attempting to delete Champion's Confidential Information (as defined in the Services Agreement), including Champion's trade secret information, in violation of the Defend Trade Secrets Act of 2016, 18 U.S.C. § 1836 ("DTSA") and the confidentiality restrictive covenants set forth in the Services Agreement signed with Champion.

Arthofer has since aggressively solicited and continues to solicit Champion's clients on behalf of Skyline, Skyline Storage, and Skyline Salt Solutions for business that competes directly with Champion's business using Champion's Confidential Information, including trade secret information, in violation of the DTSA and the non-competition, non-solicitation, and non-circumvention restrictive covenants set forth in the Services Agreement signed with Champion. In fact, Defendants have inadvertently sent emails to Champion email addresses demonstrating that Defendants are seeking to divert Champion's business to Defendants as recently as June 18, 2021.

Defendants' misconduct has substantially harmed Champion and continues unabated today, creating the risk of further serious and irreparable harm. Through this lawsuit, Champion seeks injunctive relief to stop Defendants' ongoing misconduct and to recover damages for the significant harm Defendant has caused.

## PARTIES, JURISDICTION AND VENUE

1.      Plaintiff Champion Salt, LLC is a limited liability company organized and existing under the laws of the State of Michigan with its principal place of business in St. Louis County, Missouri.  The members of Champion are (a) CB Capital Investments, LLC, a Missouri limited liability company with its principal place of business in St. Louis County, Missouri, (b) Michelle Perlmuter, an individual residing in Michigan, and (c) ELM Accounting and Finance LLC, a Missouri limited liability company with its principal place of business in St. Louis County, Missouri.

2.      The members of CB Capital Investments, LLC are Carl Bolm and Cook Family Holdings, L.L.C.  Mr. Bolm resides in Missouri.  Cook Family Holdings, L.L.C. has one member, Jeffrey L. Cook Revocable Living Trust.  The trustee of the Jeffrey L. Cook Revocable Living Trust resides in Missouri.  The sole member of ELM Accounting and Finance LLC is Lisa Myers, an individual residing in Missouri.

3.      Upon information and belief, Defendant Mark Arthofer is an adult male who currently resides in Dubuque, Iowa.  Upon information and belief, Arthofer is the principal of Skyline Mixing & Sales, LLC.

4.      Defendant Skyline Mixing & Sales, LLC is a limited liability company organized and existing under the laws of the State of Iowa with its principal place of business in Dubuque, Iowa.  Upon information and belief, no members of Skyline are citizens of the State of Missouri.

5.      Defendant Skyline Storage & Trucking, Inc. ("Skyline Storage") is a corporation incorporated and existing under the laws of the State of Iowa and has its principal place of business in Dubuque, Iowa.  Skyline Storage registered Skyline Winter Services as a fictitious name on March 8, 2021.

6.      Upon information and belief, Defendant Skyline Salt Solutions is a business name created by Arthofer, Skyline, and/or Skyline Storage.  Upon information and belief, Skyline Salt Solutions is not a citizen of the State of Missouri.

7.      This trade secret misappropriation action raises a federal question under the DTSA. Thus, this Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331. This Court has supplemental jurisdiction over Champion's other claims pursuant to 28 U.S.C. § 1367.

8.      In addition to federal question jurisdiction, this Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332(a)(1) by virtue of the diversity of citizenship of the parties and the fact that the matter in controversy exceeds the sum of $75,000, exclusive of interest and costs. Champion is a citizen of Missouri and Michigan, and no Defendants are citizens of Missouri or Michigan.

9.      Thus, there is complete diversity of citizenship between the parties and the amount in controversy exceeds the jurisdictional threshold in that Champion seeks injunctive relief to protect client relationships worth far more than $75,000 in annual profits to Champion. Additionally, Champion seeks to recover its attorney's fees and costs, which are included in the amount in controversy.  *See, e.g., Capitol Indem. Corp. v. Miles*, 978 F.2d 437, 438 (8th Cir. 1992). In short, Champion's claims exceed the jurisdictional threshold.

10.     Venue is appropriate in this District pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to Champion's claims occurred in this

District.   In addition, venue is proper in this District because as a limited liability company with its principal place of business in St. Louis County, Missouri (which is located in this District), Champion suffered injury, and continues to suffer injury, in this District as a result of Defendant's wrongful conduct.   Furthermore, the agreements that Defendant signed containing restrictive covenants were offered to Defendant by agents of Champion located in St. Louis County, Missouri.

## BACKGROUND FACTS COMMON TO ALL COUNTS

11.     Champion is a premiere supplier of bulk de-icing salt. Champion supplies superior treated and untreated bulk salt to snow and ice management contractors, municipalities, and distributors. Champion offers a variety of products and services to its customers, including premium bulk salt conditioned with yellow prussiate of soda (an anti-caking agent) and Champion Blue® branded treated bulk salt to provide enhanced de-icing solutions.

12.     Champion supplies and delivers bulk salt by the ton, via truckloads, barges, laker vessels and ocean vessels to its customers throughout the Midwest region of the United States.  To facilitate its sales and services, Champion stores bulk de-icing salt at various salt "terminals" throughout the Midwest, and Champion contracts with the owners of those terminals to store and permit Champion and its designees to deliver salt materials.

13.     Champion is the owner of valuable trade secrets related to products and services used in, or intended for use in, interstate or foreign commerce.  Champion provides its products and services primarily in the Midwest.

**A.     The Services Agreement.**

14.     On June 1, 2020, Champion, Arthofer, and Skyline entered into a Services Agreement (the "Services Agreement").  A true and correct copy of the Services Agreement (without Exhibits C and D to avoid disclosure of customer information) is attached hereto as **Exhibit 1**.

15.     On November 12, 2020, Champion, Arthofer, and Skyline executed the First Amendment to Services Agreement ("Amendment").  A true and correct copy of the Amendment is attached hereto as **Exhibit 2**.

16.     The term of the Services Agreement commenced on June 1, 2020, and continues through May 31, 2025 (the "Term") unless earlier terminated pursuant to the Services Agreement. *See* Ex. 1, § 6(a).

17.     Under the Services Agreement, Champion engaged Skyline for the purpose of mixing and treating salt product and making sales of those products to Champion's customers. *See* Ex. 1.

18.     Skyline is responsible for performing Treatment Services (as such phrase is defined in the Services Agreement at Section 4(a)) and Sales Services (as such phrase is defined in the Services Agreement at Section 2(a) and Exhibit B) of Champion's bulk salt products ("Products") and Third Party Treatment Services (as such phrase is defined in the Services Agreement at Section 4(e)) with respect to third party bulk salt products in the following states: Kentucky, Tennessee, Kansas, Minnesota, Iowa, Missouri, Illinois, Michigan, Wisconsin, Indiana, and Ohio (the "Territory"). *See* Ex. 1, § 1(d).

19.     Champion facilitates the purchasing, transfer, and sale of bulk salt orders. However, Champion contracted with Skyline for the purpose mixing and treating salt purchased by Champion and to further develop Champion's customer base and orders in the Territory.

20.     Pursuant to Arthofer's and Skyline's request, the parties agreed under the Services Agreement that the parties will discuss the possibility of Skyline or Arthofer becoming an equity owner in Champion by May 31, 2022.  Ex. 1, § 17(r).   The Services Agreement further provides that "[t]here is no guarantee that this equity ownership will be extended or obtained, but Skyline's performance hereunder shall be a consideration thereof."  Ex. 1, § 17(r).

21.     As a material term of the Services Agreement, Skyline and Arthofer agreed not to disclose Champion's Confidential Information or use any of Champion's Confidential Information (as defined in Section 10(a) of the Services Agreement) for any purpose other than performing their obligations under the Services Agreement and agreed to protect such information using at least a reasonable degree of care and not to make unnecessary copies of such information:

> (c) <u>Restrictions on Confidential Information</u>. Each Receiving Party agrees that: **(i) all Confidential Information shall be used by such Receiving Party solely for the purpose of performing its obligations hereunder and for no other purpose**; (ii) all Confidential Information shall remain at all times the property of the Disclosing Party; **(iii) no Receiving Party will allow distribution or disclosure of Confidential Information to any third party without the prior written consent of an authorized representative of the Disclosing Party**; (iv) each Receiving Party shall ensure that all confidentiality notices are reproduced in full on such copies; and **(v) each Receiving Party shall protect the Confidential Information using at least a reasonable degree of care. Copies of the Confidential Information shall only be made as strictly necessary.**

Ex. 1, § 10(c) (emphasis added).

22.     Under the Services Agreement, Skyline is prohibited from marketing or selling Products in the Territory for its own behalf or on behalf of any person or entity other than Champion.  *See* Ex. 1, § 2(a).  Furthermore, the Services Agreement states that Skyline is

prohibited from treating or mixing salt for any other person or entity for use or distribution in the Territory during the Term and from using the Equipment (as defined in the Services Agreement) to perform services for any person or entity other than Champion.  *See* Ex. 1, § 4(a), (f).

23.     Skyline and Arthofer also agreed in the Services Agreement that Skyline "shall not to circumvent, avoid, bypass, or obviate Champion or any of its Affiliates, directly or indirectly, in any transaction or prospective business relationship."  Ex. 1, § 9(d).

24.     Skyline agreed in the Services Agreement not to engage in any "unfair, anti-competitive, misleading or deceptive practices respecting the Products, including any product disparagement," and Skyline and Arthofer agreed in the Services Agreement not to "take any action that may interfere with any of Champion's rights in or to Champion's Intellectual Property Rights, including Champion's ownership or exercise thereof" or "engage in any action that tends to disparage, dilute the value of, or reflect negatively on the Products or any Champion trademark." Ex. 1, § 7 and 12(d)

25.     Section 7 of the Services Agreement further provides 'that Skyline shall not take on other representations without Champion's consent:

> Skyline may not take on representation of any other products or otherwise sell any products or services other than as contemplated by this Agreement without first reviewing the products and/or services with Champion to determine if the products are competitive in the marketplace with the Products.  If Champion determines, in its reasonable discretion, that such products or services are competitive in the marketplace with the Products or would otherwise violate this Agreement, Skyline shall not take on such representation or sell such products or services.

Ex 1, § 7.

26.     While Arthofer and Skyline are obligated under the Services Agreement to market and solicit sales of Champion products to customers within the Territory, the Services Agreement confirms that "Skyline shall have no right to accept orders on behalf of Champion."  *See* Ex. 1, § 2(b).

27.     Under the Services Agreement, Skyline is permitted to terminate the Services Agreement for Good Cause under limited circumstances on the condition that Skyline first provides "thirty (30) days prior written notice and, if capable of being cured, an opportunity to cure during such period":

> (c) <u>Termination for Good Cause by Skyline.</u> Subject to applicable law, Skyline shall have the right to terminate the Term for good cause. "Good cause," as used in this subsection (c), means (i) Champion breaches this Agreement, (ii) Champion experiences a Change of Control, or (iii) Champion is convicted of a felony or engages in serious or willful misconduct or any other behavior that tarnishes Skyline's reputation. In the event of a termination of the Term in accordance with clause (ii) of this subsection, the restrictions in Section 11 shall terminate as of the effective date of such termination. Notwithstanding the foregoing, prior to terminating this Agreement pursuant to clause (i), **Skyline shall have provided thirty (30) days prior written notice and, if capable of being cured, an opportunity to cure during such period.**

Ex. 1, § 6(c) (emphasis added).

28.     Skyline and Arthofer agreed that during the Term of the Services Agreement and for a period of two (2) years following the termination of the Term, Skyline and Arthofer will not, directly or indirectly, (i) compete against Champion within the Territory, (ii) solicit any of Champion's customers or prospective customers within the Territory, or (iii) solicit or hire any employee of Champion.  Specifically, the Services Agreement provides that Skyline and Arthofer shall not:

> (i) **engage in the marketing, distribution and/or sale of any products or services that are competitive with any products or services marketed and/or sold by any Champion Party anywhere in the Territory**, provided that, if the Term is expires as a result of Champion providing a notice of non-renewal pursuant to Section 6(a) or Champion terminating the Term pursuant to Section 6(b)(ii), then this clause (i) shall not be interpreted as prohibiting the marketing, distribution and/or sale of salt mixing and/or treatment services after such expiration or termination;

> (ii) **engage in the marketing, distribution and/or sale of bulk salt with any operating partner (including any vendor or salt supplier or producer) of any Champion Party** or call upon, solicit, contact, divert, take away, do business with or attempt to call upon, solicit, contact, divert, take away or do business with any operating partner of any Champion Party;

(iii) **call upon, solicit, contact, divert, take away, do business with or attempt to call upon, solicit, contact, divert, take away or do business with any customer or prospective customer of any Champion Party** for products or services marketed and/or sold, by any Champion Party in the Territory, provided that this clause (iii) shall not apply to Legacy Accounts following the expiration or termination of the Term; or

(iv) **solicit, hire, recruit, divert, or take away from any Champion Party the services of any of the employees, contractors or agents of any Champion Party**, or induce in any way any non-performance of any of the obligations of any such employees, contractors or agents to any Champion Party.

Ex. 1, § 11(a) (emphasis added).

29.     Section 11 of the Services Agreement again reiterates that Arthofer and Skyline shall not, "at any time, circumvent, avoid, bypass, or obviate any Champion Party, directly or indirectly, in any transaction or prospective business relationship about which any Restricted Party learned during the Term." Ex. 11, § 6(c).

30.     Arthofer and Skyline agreed under the Services Agreement that they expressly understood that Champion spent substantial time, money and effort in developing and solidifying its customer relationships and developing its Confidential Information, and that if Skyline's engagement by Champion were to cease, the protections in Section 11 identified above are necessary to protect Champion's Confidential Information and customer relationships:

(a) Each Restricted Party acknowledges that (i) **the Champion Parties have spent substantial money, time and effort in developing and solidifying their relationships with their clients and in developing their Confidential Information and customer relationships**, (ii) the Champion compensates Skyline (from which Principal obtains a material financial benefit) to, among other things, develop and preserve goodwill and relationships on behalf of the Champion Parties and to develop and maintain as confidential their Confidential Information for the exclusive ownership and use by the Champion Parties, (iii) Confidential Information and long-term customer relationships often can be difficult to develop and require a significant investment of time, effort and expense, and (iv) **if Skyline's engagement by Champion were to cease, the Champion Parties would need certain protections in order to ensure that no Restricted Party appropriates and uses any Confidential Information entrusted to the**

> **Restricted Parties or take any other actions which could result in a loss of the Champion Parties' goodwill that was generated at the Champion Parties' expense and, more generally, to prevent the Restricted Parties and others from having an unfair competitive advantage over the Champion Parties**. For the avoidance of doubt, Principal, as the sole owner of Skyline, derives a material benefit from this Agreement, and the Champion would not agree to engage Skyline without Principal (to the extent set forth herein) and Skyline agreeing to be bound by this Agreement

Ex. 1, § 13(a).

31.     Arthofer and Skyline expressly agreed under the Services Agreement that money damages would be inadequate to compensate Champion for any actual or threatened breach of Arthofer's and Skyline's restrictions set forth in Section 11:

> (h) <u>Equitable Remedies</u>. Each party agrees that money damages may not be a sufficient remedy for any breach of this Agreement and that the other party(ies) shall be entitled to seek injunctive or other equitable relief to remedy or prevent any breach or threatened breach of this Agreement. Such remedy shall not be the exclusive remedy for any breach of this Agreement but shall be in addition to all other rights and remedies available at law. The parties hereby waive the necessity of posting any form of bond relating to the issuance of injunctive relief.

Ex. 1, § 17(h).

32.     Skyline and Arthofer acknowledged that "any action or failure to act by an Affiliate of Skyline or Principal (including Skyline Storage & Trucking, Inc. or any entity operated by Principal's son, regardless of whether such entity falls within the definition of 'Affiliate') that would be a breach of this Agreement if Skyline or Principal had so acted or failed to act shall be considered a breach of this Agreement by Skyline and Principal." Ex. 1, § 13(c).

33.     Skyline and Arthofer agreed that any notices or communications sent pursuant to the Services Agreement must be in writing and, if sent by overnight delivery, shall be deemed effective and received within one (1) business day the notice or communication is delivered. Ex. 1, § 17(i).

34.     The Services Agreement states that it shall be governed in all respects by the laws of Missouri, without regard to the principles of conflict of laws, and that the parties submit to the exclusive jurisdiction of the state and federal courts located in Missouri and Iowa.  Ex. 1, §§ 17(a)-(b).

**B.      Arthofer's and Skyline's Sales Responsibilities Under the Services Agreement.**

35.     Since Arthofer's and Skyline's execution of the Services Agreement, Arthofer and Skyline were responsible for and did call upon and interact with actual and potential Champion customers in performing their responsibilities.

36.     To facilitate their performance under the Services Agreement, Champion granted Skyline access to its internal CRM tool, PipeDrive.  In PipeDrive, Champion stores customer and potential customer information, including contact information, past order information (including customer-specific pricing), notes regarding specific customer needs, customer communications, credit analysis, and other categories of information critical to identifying new customers and maintaining and growing Champion's existing customer relationships.

37.     Thus, Defendants learned the identities of certain Champion customers and their respective decision makers, the peculiar and idiosyncratic needs, likes, and dislikes of such customers, and the terms (including pricing schedules and order tonnage) of the contracts for those customers.

38.     Solely as a result of their engagement with Champion, Skyline and Arthofer know the names of and specific contacts of certain Champion customers and potential customers, the existence of and terms of the contracts between Champion and those customers, the customer feedback and opinions (positive and negative) with respect to Champion's products and services,

the customer contract history, terms and status, and the pricing of Champion's products and services.

39.     Champion handles such Confidential Information with secrecy and does not share it publicly, and such information is restricted within Champion to certain employees and contractors.

40.     Champion's confidential contract and customer information, including the identity of customers and potential customers, the terms of contracts, the rates for such contracts, marketing plans, and new products and services in development provide independent economic value to Champion.

41.     Champion's confidential contract and customer information, including the identity of customers and potential customers, the terms of contracts, the rates for such contracts, marketing plans, and new products and services in development are used in Champion's business and give Champion a competitive advantage over competitors who do not know Champion's above-described information.

42.     Champion undertakes reasonable measures to keep confidential and secret its confidential contract and customer information, including the identity of customers and potential customers, the terms of contracts, marketing plans, and new products and services in development.

43.     For example, Champion requires certain third-party contractors to agree to confidentiality and non-solicitation covenants, as Skyline and Arthofer did.

44.     In addition, Champion's Confidential Information, including its PipeDrive data, is generally password protected, and Champion conducts security monitoring of external e-mails and document transfers.

45.    Champion gains a benefit from having its confidential information and trade secrets remain unknown outside Champion. Conversely, Champion's competitors would profit at Champion's expense from knowing such information and trade secrets.

46.    Defendants' relationship with Champion provided them unique opportunities to build relationships with key decision makers on behalf of Champion's customers and potential customers, as well as with key terminal operators and trucking contractors. Due to those relationships and Defendants' access to Champion's confidential information, Defendants have the ability to compete unfairly with Champion, thereby diverting those clients from Champion to its competitors.

**C.    Defendants' Misappropriation of Champion's Trade Secrets.**

47.    During Spring 2021, Arthofer began aggressively seeking an equity ownership stake in Champion, frequently requesting to meet to discuss how he could become an equity owner and the timeline for becoming an owner.  However, as explained above, the Services Agreement only required the parties to *discuss* the potential for Mr. Arthofer to become an equity owner by *May 2022.*

48.    Champion repeatedly informed Arthofer that it would discuss with him the opportunity to obtain an equity stake in Champion following its reconciliation of the 2020-2021 business season.

49.    On May 31, 2021, Arthofer sent Mr. Perlmuter an email in which he expressed excitement with Champion, stating "[n]ow June 1 is here and we have to put decision making into hyper speed to make Champion all that it can be. I am ready to rock this thing!! I hope you are?" To his email, Arthofer attached a Word document with a proposal for "Marks [sic] Compensation

as a working partner" and other proposals to Champion, including making Arthofer Champion's Chief Operating Officer.

50.     In response to Arthofer's requests for a meeting to discuss his desire to become a partner of Champion and to increase Champion's inventory throughout the Midwest, on June 4, 2021, Mr. Gary Perlmuter, Champion's Chief Executive Officer, informed Arthofer that Mr. Perlmuter preferred to have a call after Champion's concerns with Skyline's outstanding account balances and inventory concerns were addressed.

51.     In advance of June 4, 2021, Champion frequently advised Arthofer that Skyline was underperforming in terms of sales and accounts receivable collections, as well breaching the Services Agreement by extending credit on behalf of Champion without authorization to Champion's customers.

52.     Despite expressing interest in becoming a partner of Champion *four days earlier*, on June 4, 2021, Arthofer emailed Mr. Perlmuter, informing Mr. Perlmuter that "it may be best" if Skyline, Arthofer, and Champion "part ways" and that Arthofer intended to notify Skyline's sales team that "champion salt is exiting the Midwest seems to be the vibe I am getting."  Arthofer closed his email by instructing Mr. Perlmuter to "[p]lease send my release to my contract I will be moving on."

53.     Shortly after sending the email to Champion in which Arthofer informed Champion he would be "moving on," he sent a second email in which he disparaged Champion and its leadership, informing them that he wanted to terminate the Services Agreement and that he would be "proceeding with termination papers on Monday":

> Here is a summary of the tons of prepaid salt and our Midwest A/R which is not truly represented. I put in an email to Gary and now I will to all of you. **I feel as though Champion is exiting the Midwest so I would appreciate that my contract be terminated.** I will not work with a company nor support a company

that is so unorganized and unprofessional. **I will be proceeding with termination papers on Monday. I will let my sale team that I met with today know that we will not be doing sales under the Champion Name in 2021-22.** Do know that I have been trying to work with Champion to come to some kind of resolution and to no avail has there been any attempt on Champion part to remedy. Thanks for the experience I would like to say it has been a good one but it hasn't.

54.     Arthofer did not serve any notice of default or termination of the Services Agreement following his June 4 emails.  Champion also took no action with respect to the Services Agreement, and the Services Agreement remains effective and enforceable.

55.     On or about June 1, 2021, Champion learned there was a substantial amount information deleted from its PipeDrive database by an individual using the PipeDrive login credentials issued to Skyline and Arthofer.  During its review, Champion discovered that on May 21, 2021 and May 26, 2021, an individual using the PipeDrive login credentials issued to Skyline and Arthofer to perform their duties under the Services Agreement accessed and downloaded nearly all of Champion's PipeDrive database information pertaining to the Territory without authorization.

56.     The information downloaded by the individual using Skyline's credentials includes Champion's customer contact information, customer-specific pricing and notes, and other critical information necessary for Champion to establish and grow its customer relationships.

57.     Upon information and belief, Mr. Arthofer, or an individual at his direction, accessed and downloaded Champion's PipeDrive database information on May 21, 2021 and May 26, 2021.

58.     On May 28, 2021, an individual using the PipeDrive login credentials issued to Skyline and Arthofer to perform their duties under the Services Agreement accessed and attempted to permanently delete hundreds of sets of contact information for potential customers in the Territory located within Champion's PipeDrive database.  The information that the individual

attempted to permanently delete included information about customers to whom Champion is actively soliciting sales of its products.

59.     Upon information and belief, Mr. Arthofer, or an individual at his direction, was the individual who accessed and attempted to delete Champion's PipeDrive database information on May 28, 2021.

60.     Following Champion's discovery that Arthofer and Skyline were accessing, downloading, and attempting to delete Champion's customer information, on June 7, 2021, Champion informed certain terminals at which it stores salt materials that Skyline was not authorized to access Champion's salt piles.   Champion also limited Skyline's access to its electronic resources, including by restricting Skyline and Arthofer from exporting or deleting information from Champion's PipeDrive database.

61.     While Champion would not permit Skyline to continue taking materials from the terminals without authorization and it took steps to further protect its confidential and trade secret information, it did not terminate or take any other action under the Services Agreement or hinder Skyline and Arthofer from performing their duties under the Services Agreement.

**D.     Defendants Brazenly Solicit and Interfere with Customers and Compete with Champion in Violation of the Services Agreement.**

62.     Following Arthofer's statement to Champion on June 4, 2021 that Skyline "will be moving on", Defendants continued with their scheme to interfere with and achieve a competitive advantage from Champion's customer relationships using Champion's confidential and trade secret information.

63.     For example, on June 8, 2021, a customer of Champion's contacted Champion to request a cancellation of its May 4, 2021 agreement to purchase de-icing salt for approximately $800,000. When Champion inquired about the reason for the cancellation, the customer advised

Champion that Arthofer had advised it that Champion did not have the salt or other resources to fulfill the order and that the customer should cancel the order.  The statements by Arthofer were an attempt to interfere with Champion's customer relationships and a violation of the defamation prohibitions of the Services Agreement.

64.     On information and belief, on or about June 8, 2021, Arthofer contacted Compass Minerals, a vendor of Champion, for the purpose of purchasing product in an effort to compete with Champion.

65.     Also on June 8, 2021, Calvin Koeller, Executive Assistant for Skyline, contacted a Champion customer to falsely represent to the customer that "Champion Salt has discontinued their relationship" with Skyline and to solicit the customer's business on behalf of Skyline.

66.     In response to Defendants' solicitation, the customer identified in paragraph 65 created a new purchase order for Skyline Winter Services, the fictitious name used by Skyline Storage.

67.     On June 9, 2021, counsel for Skyline and Arthofer sent a letter to Mr. Perlmuter, Champion's CEO.  The letter from Skyline's and Arthofer's counsel, in part, (1) falsely asserts that *Champion* terminated the Services Agreement without cause, (2) informed Champion that Skyline and Arthofer "were preparing to terminate the Services Agreement", (3) reserved "the right to deliver a notice of default to Champion pursuant to the terms of the Services Agreement", and (4) stated that "the restrictive covenants set forth in Section 11 of the Services Agreement (including any and all non-competition and non-solicitation provisions) do not apply to Skyline or Mark Arthofer and are of no further force or effect."

68.     As evidenced by the June 9, 2021 letter from Skyline's and Arthofer's counsel, no party terminated the Services Agreement and Skyline has not served any written notice of default

or provided a thirty (30) day written notice of Skyline's intent to terminate the Services Agreement as required under Section 6(c).  *See* Ex. 1, § 6(c).  The assertion that Champion terminated the Services Agreement is false.

69.     On the following day, June 10, 2021, Arthofer sent Mr. Koeller an email with the subject "salt pricing", to which Arthofer attached a spreadsheet that included Champion's salt pricing at each of its terminals throughout the United States, and a separate document titled "Skyline Terminal salt pricing" that places information taken from Champion's spreadsheet on a "Skyline Winter Services" letterhead.

70.     On June 13, 2021, Arthofer sent an email to individuals at Heacock & Jones Financial Services, Inc., a financial services firm, attaching documents labeled "Narrative [sic] for Skyline winter services salt company.doc", "Skyline Terminal salt pricing.doc", as well as spreadsheets labeled "% Comparison.xlsx" and "salt equations per terminal.xlsx."

71.     In the document labeled "Narrative [sic] for Skyline winter services salt company.doc", Arthofer falsely states that "[d]uring negotiations of how Champion was going to handle compensation for past tasks that weren't part of the original contract and how the 2021-22 season were to be handled Champion on 6/4/21 terminated its contract with Skyline with no cause."

72.     In the file labeled "% Comparison," Arthofer included a spreadsheet labeled "Forecast Income Statement" for "Skyline Winter Services - Salt Division" for the 2021-2022 season.

73.     The materials prepared by Arthofer and attached to his June 13, 2021, email include pricing information for Skyline which merely reduces the prices used by Champion and demonstrates Defendants' intent to solicit Champion's customers for the same products and services provided by Champion.  Notably, on May 27, 2021 – the day prior to Arthofer's attempted

deletion of information from Champion's PipeDrive – Arthofer requested and obtained from Champion a final pricing sheet for Champion's locations across the Midwest under the premise that he would be using that information to solicit sales on behalf of Champion.

74.     On June 14, 2021, Mr. Koeller emailed Arthofer to inform him that Champion's customer, Langton Group, called Mr. Koeller seeking to diversify their suppliers and that Mr. Koeller informed the customer that Mr. Koeller would respond within 48 hours.  Mr. Koeller informed Arthofer that the salt could be taken "out of Milwaukee or Chicago based on trucking rates."

75.     On June 15, 2021, Arthofer emailed Mr. Koeller a Word document titled "Skyline Mixing and Sales, LLC – form letter for use by Legacy Account customers."  The Word document sent by Mr. Koeller appears to be a letter that Defendants have sent or intend to send to Champion's customers in an effort to transfer the customer accounts to Defendants.  The reference to Champion violates Section 17(m) of the Services Agreement prohibiting public announcements without prior consent.  The Word document was drafted to be sent to Mr. Perlmuter at Champion and states as follows:

> We understand that the business relationship between Skyline Mixing and Sales, LLC and Mark Arthofer and Champion Salt, LLC has ended.  We want to continue to do business with Skyline and Mark Arthofer as we have done in the past.  Please transfer all of our information, including any contracts, to Mark Arthofer and Skyline immediately.  Please also transfer the deposit we have made to you in the amount of $_____ to Skyline immediately.

> We are aware that we are a "Legacy Account" pursuant to the Services Agreement between Skyline, Mark Arthofer and Champion Salt, and that upon the termination of that Services Agreement, our information is to be returned to Skyline.  It is our intention to continue to do business with Skyline and Mark Arthofer going forward.  Thank you.

76.     On information and belief, Defendants have further solicited Langton Group's business on behalf of Defendants.

77.     On June 16, 2021, Mr. Koeller emailed Arthofer and other Skyline employees to notify them that Skyline would be creating a new company, Skyline Salt Solutions.  Mr. Koeller also sent the Skyline employees a new logo, tagline, and marketing suggestions, and informed the Skyline employees that he was creating information packets.

78.     Also on June 16, 2021, Arthofer emailed several individuals with Skyline-related email addresses the following message:

> Okay everyone lets hit the ground running. I need to acquire as many sales contracts as we possibly can.
>
> Calvin will be working on getting pipe drive accounts set up, email addresses set up
>
> I have provided the pricing sheet, I am sure you will have questions so feel free to call me. Darrell is out of the office for a bit so please forward all questions my way until he is up and going again. Thanks

79.     On June 16, 2021, Mr. Koeller sent to himself an email that appears to be an announcement for Skyline Salt Solutions.  The email states that "Skyline Salt Solutions has separated from Champion Salt, LLC", that "Skyline is excited to provide the same great services with expanded products", and that Skyline Salt Solutions "wishes to become our partners' single source for winter risk management products." The email informs the recipient that Skyline will attend the Snow and Ice Management Association ("SIMA") Road Show events.

80.     On June 18, 2021, Mr. Koeller sent an email to at least one Champion customer, in which Mr. Koeller sent the customer salt pricing and asked the customer if the customer wanted Mr. Koeller to "**redo the contracts through Skyline**" rather than through Champion.

81.     On information and belief, Defendants are continuing to aggressively solicit business from Champion's customers within the Territory for the same products and services

offered by Champion and using Champion's confidential and trade secret information in their efforts to divert business from Champion to Defendants.

82.    Defendants did not request, and did not receive, consent from Champion to represent competitive products and services.

83.    On information and belief, Defendants have advised Champion's customers not to pay Champion's invoices, in interference with Champion's relationship with its customers.

84.    Champion fully compensated Defendants Arthofer and Skyline for all amounts due and owing to Skyline or Arthofer under the Services Agreement.

85.    On information and belief, Defendants have been successful in soliciting Champion clients to stop using Champion's services and to begin using Defendants' services.

86.    Defendants are direct competitors of Champion's in the bulk de-icing salt supply industry.

87.    Since at least June 8, 2021, Defendants have solicited Champion's customers in the Territory in violation of the Services Agreement.  During Skyline's engagement with Champion, Skyline and Arthofer were paid for their efforts in satisfying orders from the customers Defendants are now soliciting and accepting business from on behalf of Defendants.

88.    On information and belief, Defendants are utilizing the customer relationships they maintained and grew on behalf of Champion to solicit the sale of similar products and services to those same clients on behalf of Defendants.

89.    Champion has expended significant time and resources to maintain and grow the customer relationships threatened by Defendants' unlawful conduct.

90.    Based on these facts, unless Defendants are enjoined from soliciting Champion's clients in the Territory, Champion will suffer irreparable harm.

91.     As a result of Defendants' actions described herein, Champion has incurred significant attorneys' fees to address Defendants' misconduct and to recover the damages that Defendants have inflicted on Champion.

92.     All conditions precedent to the institution and maintenance of this action have occurred or have been performed.

## COUNT I
## BREACH OF CONTRACT
### (Defendants Skyline and Arthofer)

93.     Plaintiff re-alleges and incorporates by reference Paragraphs 1 through 92 of this Complaint in Count I as if fully set forth herein.

94.     The Services Agreement constitutes a valid and enforceable contract between Champion, Skyline, and Arthofer.

95.     The parties accepted the terms of the Services Agreement, the parties received consideration pursuant to the Agreement, and the Agreement has definite and certain terms.

96.     Champion performed all conditions required of it under the Services Agreement.

97.     Under the Services, Defendants Skyline and Arthofer agreed, among other things, that during the Term and for two (2) years following the termination of the Term, they would not perform the following activities:

(i) **engage in the marketing, distribution and/or sale of any products or services that are competitive with any products or services marketed and/or sold by any Champion Party anywhere in the Territory**, provided that, if the Term is expires as a result of Champion providing a notice of non-renewal pursuant to Section 6(a) or Champion terminating the Term pursuant to Section 6(b)(ii), then this clause (i) shall not be interpreted as prohibiting the marketing, distribution and/or sale of salt mixing and/or treatment services after such expiration or termination;

(ii) **engage in the marketing, distribution and/or sale of bulk salt with any operating partner (including any vendor or salt supplier or producer) of any Champion Party** or call upon, solicit, contact, divert, take away, do business with

or attempt to call upon, solicit, contact, divert, take away or do business with any operating partner of any Champion Party;

(iii) **call upon, solicit, contact, divert, take away, do business with or attempt to call upon, solicit, contact, divert, take away or do business with any customer or prospective customer of any Champion Party** for products or services marketed and/or sold, by any Champion Party in the Territory, provided that this clause (iii) shall not apply to Legacy Accounts following the expiration or termination of the Term; or

(iv) **solicit, hire, recruit, divert, or take away from any Champion Party the services of any of the employees, contractors or agents of any Champion Party**, or induce in any way any non-performance of any of the obligations of any such employees, contractors or agents to any Champion Party.

Ex. 1, § 11(a) (emphasis added).

98.     Furthermore, Skyline and Arthofer agreed not to disclose Confidential Information belonging to Champion and to use all of Champion's Confidential Information (as defined in the Services Agreement) only for the purpose of performing their obligations under the Services Agreement:

(c) <u>Restrictions on Confidential Information</u>. Each Receiving Party agrees that: (i) all Confidential Information shall be used by such Receiving Party solely for the purpose of performing its obligations hereunder and for no other purpose; (ii) all Confidential Information shall remain at all times the property of the Disclosing Party; (iii) no Receiving Party will allow distribution or disclosure of Confidential Information to any third party without the prior written consent of an authorized representative of the Disclosing Party; (iv) each Receiving Party shall ensure that all confidentiality notices are reproduced in full on such copies; and (v) each Receiving Party shall protect the Confidential Information using at least a reasonable degree of care. Copies of the Confidential Information shall only be made as strictly necessary.

Ex. 1, § 10(c).

99.     Under the Services Agreement, Skyline and Arthofer are prohibited from marketing or selling Products for their own behalf or on behalf of any person or entity other than Champion. *See* Ex. 1, § 2(a).  The Services Agreement prohibits Skyline from treating or mixing salt for any other person or entity for use or distribution in the Territory during the Term.  *See* Ex. 1, § 4(a).

100.    Under the Services Agreement, Skyline and Arthofer must continue to carry out their obligations unless the Services Agreement is terminated pursuant to Section 6.  Despite there being no termination by either party, Skyline and Arthofer have ceased performing under the contract and are no longer providing services, in violation of the Services Agreement. Ex. 1, §§ 2,4,6.

101.    Under the Services Agreement and during the Term, Skyline and Arthofer are prohibited from marketing and selling Products in the Territory for themselves or any other entity, other than Champion.  Ex. 1, § 2(a).  Furthermore, during the Term, Champion is prohibited from appointing any person or entity or than Skyline and Arthofer to market and sell the Products in the Territory to any customer other than the House Accounts. Ex. 1, § 2(a).

102.    Additionally, Skyline and Arthofer also agreed in the Services Agreement that they "shall not to circumvent, avoid, bypass, or obviate Champion or any of its Affiliates, directly or indirectly, in any transaction or prospective business relationship."  Ex. 1, § 9(d). Skyline and Arthofer also agreed that for a period of two years, they would not "circumvent, avoid, bypass, or obviate any Champion Party, directly or indirectly, in any transaction or prospective business relationship about which any Restricted Party learned during the term." Ex. 1, § 11(c).

103.    Through the actions described herein, Defendants Skyline and Arthofer have breached the promises in the Services Agreement.  Defendants Skyline and Arthofer have solicited and continue to solicit customers of Champion within the Territory, and Defendants has solicited, accepted and continues to accept business from Plaintiff's customers in direct violation of Section 11(a) of the Services Agreement.

104.    Through the actions described herein, Defendants Skyline and Arthofer have used and disclosed Champion's Confidential Information in violation of Section 10(c) of the Services Agreement.

105.    Through the actions described herein, Defendants Skyline and Arthofer have ceased performing and providing services pursuant to Sections 2 and 4 of the Services Agreement, despite there being no termination, in violation of the Services Agreement.

106.    Through the actions described herein, Defendants Skyline and Arthofer have marketed or sold Products on behalf of Defendants and have circumvented Champion in transactions and prospective business relationships in violation of Sections 2(a) and 9(d) of the Services Agreement.

107.    On information and belief, Defendants Skyline and Arthofer have disparaged Champion's products and services in violation of Sections 7 and 12(d) of the Services Agreement.

108.    By virtue of the foregoing events and actions taken by Defendants, Defendants have caused, and will cause in the future, substantial, immediate, and irreparable harm to Plaintiff, its business, and its operations through Defendant's violation and continued breach of the Services Agreement.

109.    Through the factual allegations contained herein, Champion has established a likelihood of success on the merits, that there exists no adequate remedy at law, and that a balancing of the equities favors the entry of an injunction against Defendants.

110.    Unless Defendants are preliminarily and permanently enjoined from committing and continuing to commit the foregoing conduct, Plaintiff will be irreparably harmed.

WHEREFORE, Champion requests the relief as recited at the conclusion of all Counts in this Complaint below.

<u>COUNT II</u>
**VIOLATION OF THE DEFEND TRADE SECRETS ACT**
**(All Defendants)**

111.     Plaintiff re-alleges and incorporates by reference Paragraphs 1 through 110 of this

Complaint in Count II as if fully set forth herein.

112.     Champion is the owner of valuable trade secrets related to products and services

used in, or intended for use in, interstate or foreign commerce.

113.     Defendants have improperly misappropriated, and threaten to further

misappropriate, Champion's trade secrets through the improper disclosure and use of such secrets.

114.     Any disclosures or use of Champion's trade secrets by Defendants were not and

will not be with Champion's consent, and such disclosures and uses violate the DTSA. Indeed,

such disclosures also violate the terms of the agreement Defendants Arthofer and Skyline signed

with Champion, further reflecting that Defendants' use and disclosures were not and are not

authorized by Champion.

115.     Champion has made reasonable efforts to maintain the confidentiality of its trade

secrets.

116.     Champion derives independent economic value from its trade secrets not being

generally known to, and not being readily ascertainable through proper means by, other persons

who could obtain economic value from Champion's trade secrets.  For example, Champion derives

economic value from its competitors not knowing the confidential customer information that

Defendants accessed as third-party contractors of Champion contained within Champion's

PipeDrive database because competitors would be in a position to unfairly compete with and

undercut Champion's pricing with such customers if those competitors had access to such

confidential customer information.

117.    Defendants acquired Champion's trade secrets, including without limitation confidential customer information, under circumstances giving rise to a duty to maintain the secrecy of such information and to not use such information without Champion's authorization.

118.    Defendants' threatened and/or actual use and disclosure of Champion's trade secrets constitute misappropriations under the DTSA.  Defendants have, for example, used Champion's trade secrets, including without limitation Champion's confidential customer information, to call upon Champion's customers in competition with Champion.  Champion did not consent to Defendant's taking and use of such trade secret information, including without limitation Champion's confidential customer information.  As a result of that unauthorized use of Champion's trade secrets to identify and pursue Champion's customers on behalf of Defendants, Defendants have violated the DTSA.

119.    Moreover, Defendants' violations of the DTSA reflects their disregard of Champion's rights under the DTSA and evidence their intent to continue to violate Champion's statutory rights.

120.    Defendants continue to improperly use and retain these trade secrets for their own use in order to gain economic value from Champion's trade secret information.

121.    As a direct and proximate result of Defendant's misappropriation of Champion's confidential information, including trade secrets, Champion has been damaged and will continue to be damaged in an amount to be proven at trial.

WHEREFORE, Champion requests the relief as recited at the conclusion of all Counts in this Complaint below.

## COUNT III
## VIOLATION OF THE MISSOURI COMPUTER TAMPERING ACT, § 537.525, RSMO.
### (Defendants Skyline and Arthofer)

122.    Plaintiff re-alleges and incorporates by reference Paragraphs 1 through 121 of this Complaint in Count III as if fully set forth herein.

123.    On information and belief, Defendant Arthofer, on behalf of Skyline, tampered with Champion's computer data, including its PipeDrive database, and defrauded Champion by destroying and deleting data and/or documentation that existed on Champion's computer or computer system, without authorization, without reasonable grounds to believe that he had such authorization and with the willful and malicious intention of causing harm to Champion.

124.    Defendants tampered with Champion's computer data and defrauded Champion by taking, retaining, stealing, embezzling, using and/or disclosing data from Champion's computer or computer system, without authorization, without reasonable grounds to believe that they had such authorization and with the willful and malicious intention of causing harm to Champion.

125.    Defendants' aforementioned actions were without authorization from Champion.

126.    Not only were Defendants' actions done without authorization, Defendants' actions were brazen, intentional, willful and malicious in that Defendants knew that such actions were expressly prohibited by Champion and would cause harm to Champion.

127.    Champion has been damaged by Defendants' scheme to defraud and willfully and maliciously injure Champion through the unauthorized and  destruction and deletion of data from Champion Salt's computers, and Defendant's taking, theft, embezzlement, retention, use, and/or of Champion's data because Champion has incurred – and will continue to incur – fees and costs for the examination of computer and email files and because Defendants received an unfair competitive advantage over Champion and were positioned to (and did in fact) attempt to divert business from Champion.

128.     In engaging in the foregoing conduct, Defendants' actions were willful and malicious, were performed with an evil motive and with reckless indifference to the rights of Champion and Champion's clients and were intended to defraud and willfully and maliciously injure Champion.

129.     Pursuant to the Missouri Computer Tampering Act, Champion is entitled to recover all of its attorneys' fees and costs incurred enforcing its rights against Defendant.

WHEREFORE, Champion requests the relief as recited at the conclusion of all Counts in this Complaint below.

## COUNT IV
## CIVIL CONSPIRACY
## (All Defendants)

130.     Plaintiff re-alleges and incorporates by reference Paragraphs 1 through 129 of this Complaint in Count IV as if fully set forth herein.

131.     Defendants' concerted actions alleged herein constitute an agreement between at least two people for the purpose of accomplishing unlawful acts or to accomplish lawful acts in an unlawful manner.

132.     Defendants conspired to, *inter alia*, (1) breach the Services Agreement; and (2) misappropriate Champion's Confidential Information and trade secrets.

133.     Defendants engaged in concerted and tortious actions alleged herein in furtherance of the conspiracy, including, *inter alia*, when Defendants instructed a Champion customer to submit a new purchase order for Skyline Winter Services, a fictitious name used by Skyline Storage, in furtherance of Skyline's efforts to divert that customer's business from Champion to Skyline.

134.    Defendants also created Skyline Salt Solutions in furtherance of Defendants' conspiracy to divert business from Champion to Defendants using Champion's Confidential Information and trade secrets.

135.    As a result of the Defendants' concerted action, Champion has been damaged, the amount of which damage is to be determined by the Court.

**REQUESTED RELIEF**

WHEREFORE, Champion respectfully prays for the following relief:

a.      For preliminary and permanent injunctive relief enjoining Defendants such that Defendants and all others acting in concert with them be enjoined and restrained, for the remainder of the Term set forth in the Services Agreement, and a period of two (2) years following termination of the Term (including applicable tolling pursuant to Section 11(b)), from directly or indirectly:

> (i) engaging in the marketing, distribution and/or sale of any products or services that are competitive with any products or services marketed and/or sold by any Champion Party anywhere in the Territory;

> (ii) engaging in the marketing, distribution and/or sale of bulk salt with any operating partner of Champion, including Compass Minerals, or calling upon, soliciting, contacting, diverting, taking away, doing business with or attempting to call upon, solicit, contact, divert, take away or do business with any operating partner of Champion;

> (iii) calling upon, soliciting, contacting, diverting, taking away, doing business with or attempting to call upon, solicit, contact, divert, take away or do business with any customer or prospective customer of Champion for products or services marketed and/or sold, by Champion in the Territory; and

> (iv)  disclosing, divulging, discussing, copying, or otherwise using any of Champion's Confidential Information, including trade secrets, and proprietary information.

b.      For an order requiring Defendants and all others acting in concert with them to return all of Champion's Confidential Information.

c.      For a preliminary and permanent injunctive relief enjoining Defendants such that Defendants and all others acting in concert with them be enjoined and restrained, directly or indirectly, from:

>   (i) using Champion's Confidential Information except for in the performance of services under the Services Agreement; and

>   (ii) violating the non-solicitation/non-interference, non-circumvention, and exclusivity provisions in the Services Agreement.

d.      For an order requiring an accounting of all profits, compensation, commissions, remuneration, or benefits which Defendants have realized or may realize in the future as a result of any unfair competition;

e.      For damages in an amount that is fair and reasonable;

f.      For exemplary and punitive damages;

g.      For Champion's attorneys' fees and costs incurred herein; and

h.      For such other relief that this Court deems to be just and proper.

Respectfully submitted,

By:  s/ Brian Kaveney
    William R. Price, #29142MO
    Brian Kaveney, #58310MO
    Ida Shafaie, #66220MO
    Jason Stavely, #69364MO
    Armstrong Teasdale LLP
    7700 Forsyth Boulevard, Suite 1800
    St. Louis, Missouri 63105
    314.621.5070
    314.621.5065 (Facsimile)
    wprice@atllp.com
    bkaveney@atllp.com
    ishafaie@atllp.com
    jstavely@atllp.com

**ATTORNEYS FOR PLAINTIFF
CHAMPION SALT, LLC**