UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| CHAMPION SALT, LLC, | ) |
| Plaintiff, | ) ) ) |
| v. | ) Case No. 4:21-CV-00755-JAR |
| MARK J. ARTHOFER, et al., | ) ) ) |
| Defendants. | ) ) |

**MEMORANDUM AND ORDER**

This matter is before the Court on Defendants' Motion for Modification of the Temporary Restraining Order. (Doc. 58). The motion is fully briefed and ready for disposition. For the reasons discussed below, the motion will be granted in part.

**I.   BACKGROUND**

Factual Background

Plaintiff Champion Salt, LLC ("Champion") is a bulk supplier of de-icing salt to snow and ice management contractors, municipalities, and distributors in the Midwest. (Doc. 1 at ¶ 11). Champion stores its salt at various terminals and permits its designees to make deliveries from the terminals. (*Id.* at ¶ 12). Defendant Mark Arthofer is the Principal of Skyline Mixing & Sales, LLC ("Skyline"), which mixes and treats salt. (*Id.* at 1). On June 1, 2020, Champion, Arthofer, and Skyline entered into a Services Agreement (the "Services Agreement") pursuant to which Champion engaged Skyline to mix and treat salt ("Treatment Services") and make sales on a commission basis ("Sales Services"). (*Id.* at ¶¶ 14-17; Doc. 1-3). The Services Agreement also required that the parties "discuss by May 31, 2022 the possibility of Skyline or [Arthofer] becoming an equity owner in Champion." (Doc. 1-3 at § 17(r)).

1

The parties' relationship soured in 2021 as Arthofer "began aggressively seeking an equity ownership stake in Champion." (Doc. 1 at ¶ 47). On May 31, 2021, Arthofer sent Gary Perlmuter, Champion's CEO, an e-mail stating: "Now June 1 is here and we need to put decision making into hyper speed to make Champion all that it can be. I am ready to rock this thing!! I hope you are?" (Doc. 4-4 at 1). Arthofer continued pushing for a Zoom conference to discuss compensation and potential equity ownership. (Doc. 4-5 at 2). On June 4, 2021, Perlmuter responded that he was "not sure it's a good idea for [Arthofer] to press for a call right now" as Champion had reviewed financial performance and "have some shock with the amount of past due [accounts receivable] and (more importantly) salt inventory left on the ground in the Midwest." (*Id.* at 1). Arthofer promptly replied that "it may be past if we part ways," he had "never experienced such a disorganized unprofessional group," and requested that Champion "send [his] release to [his] contract" because he "will be moving on." (*Id.*). In a subsequent e-mail, Arthofer reiterated that he "would appreciate that [his] contract be terminated" and he would "be proceeding with termination papers on Monday." (Doc. 4-6 at 1).

A few days later, on June 9, 2021, Arthofer and Skyline's attorney sent a formal notice to Perlmuter indicating that it "is Skyline's and Mr. Arthofer's position that the Services Agreement was terminated without good cause by Champion," thereby rendering various restrictive covenants void. (Doc. 4-7 at 2). The supposed termination was based on the fact that Skyline and Arthofer had been denied access to Champion's systems, and a Champion employee informed a team that Skyline was "no longer associated with Champion [ ]. Please do not accept any orders from them nor allow them access to our salt piles." (*Id.* at 1). The attorney's letter alternatively suggested that Skyline and Arthofer were prepared to provide notice and terminate for good cause. (*Id.* at 2).

After June 8, 2021, as alleged by Champion and supported by e-mail evidence and affidavits, Arthofer and Skyline began aggressively targeting Champion customers using

2

Champion's proprietary customer and pricing information. (Doc. 4 at 6-7; Doc. 4-1). For example, a customer supposedly requested to cancel an $800,000 salt order with Champion because the customer had been told by Arthofer that Champion could not fulfill the order. Champion also learned that in late May 2021, an individual using credentials issued to Skyline and Arthofer allegedly "accessed and downloaded nearly all of Champion's [customer relationship management] database information . . . without authorization" and then "attempted to permanently delete hundreds of sets of contact information for potential customers." (Doc. 1 at ¶¶ 56-58; Doc. 4-14). Champion explains that it terminated Skyline and Arthofer's access in order to protect its confidential information but did not terminate the Services Agreement. (Doc. 4-1 at ¶¶ 31-33). Defendants respond that they were merely organizing data, not stealing or deleting information. This litigation soon followed.

Procedural Background

On June 22, 2021, Champion filed its complaint (Doc. 1) and Motion for Temporary Restraining Order and Preliminary Injunction (Doc. 3) in this Court. The complaint includes four counts: Breach of Contract (Count I); Violation of Defend Trade Secrets Act (Count II); Violation of Missouri Computer Tampering Act, MO. REV. STAT. § 537.525 (Count III); and Civil Conspiracy (Count IV). Champion generally alleges that Defendants have breached restrictive covenants and other provisions of the Services Agreement by using Champion's confidential information to offer competitive products and services. Defendants respond that Champion breached first and effectively terminated the Services Agreement without good cause thereby voiding the restrictive covenants.

This Court held an in-person TRO hearing on June 25, 2021. Following the hearing, the parties consented to a proposed TRO (Doc. 17), which this Court entered. (Doc. 18). Pursuant to

3

the TRO, Defendants may not "[s]olicit Champion's customers and prospective customers" or engage in the "sale of any products or services that are competitive" with Champion in certain states, among other restrictions. (*Id.* at § 1(i-ii)). On July 7, 2021, upon request by Defendants, this Court extended the TRO through July 23, 2021 and set a preliminary injunction hearing for that day. (Doc. 34).

The parties were not able to complete the preliminary injunction hearing during the time allotted. Accordingly, the remainder of the preliminary injunction hearing will be completed on August 11, 2021, and the Court has determined that good cause exists to extend the TRO through such time. (Doc. 57). On July 26, 2021, Defendants filed this motion to amend the TRO. Defendants request that the "current TRO be modified to permit Skyline and Mark Arthofer to interact and do business with their Legacy customers as identified in Exhibit C to the Services Agreement." (Doc. 58 at 12).[1] Also pending before this Court is Champion's Motion for Contempt and to Enforce Temporary Restraining Order, which alleges that Defendants breached the TRO by making a salt delivery to a Champion customer. (Doc. 22).

**II.   DISCUSSION**

This litigation primarily concerns whether the restrictive covenants found in § 11 of the Services Agreement remain in effect. The non-competition and non-solicitation provisions generally apply during the term of the Services Agreement and for two years thereafter. (Doc. 1-3 at § 11(a)). The Services Agreement specifically provides, however, that "in no event shall the non-competition, non-solicitation or other restrictive covenant provisions . . . apply if the

---

[1] Defendants' motion includes numerous arguments unrelated to the narrow question of whether Defendants should be permitted to do business with the Legacy Customers (defined below). Because the only relief requested in the motion is modification of the TRO to permit doing busines with the Legacy Customers (Doc. 58 at 12), this Court declines to address these extraneous arguments, which are more suited to the question of whether a preliminary injunction should be issued.

4

[Services] Agreement is terminated by Champion pursuant to Section 6(a) or terminated by Skyline pursuant to Section 6(c)." (*Id.* at § 11(d)). The key, overarching issue in this case will be whether Champion effectively relieved Defendants of their obligation to comply with the restrictive covenants because § 11(d) was triggered or for some other reason.

The parties entered the current TRO by consent.[2] The TRO broadly prohibits Defendants from "[s]oliciting Champion's customers and prospective customers . . . or interfering with or attempting to interfere with Champion's relationships with any of its customers and prospective customers." (Doc. 18 at § 1(i)). The TRO also prevents Defendants from "[e]ngaging in the marketing, distribution and/or sale of any products or services that are competitive with any products or services marketed and/or sold by Champion" in specific states. (*Id.* at § 1(ii)). This language roughly tracks provisions in § 11(a) of the Services Agreement.

The instant motion specifically concerns whether the TRO should be amended to permit Defendants to do business with "Legacy Customers," which are set forth in Exhibit C to the Services Agreement. (Doc. 1-3 at § 2(d)). Exhibit C identifies 278 Legacy Customers that, in this Court's understanding, Defendants had a relationship with prior to entering the Services Agreement. There are two relevant carve-outs regarding the Legacy Customers in the Services Agreement. First, the parties agreed that upon termination "Champion shall have no further rights to use the Legacy Account information" and such information shall be returned to Defendants upon request. (*Id.* at § 10(a)). Second, § 11(a)(iii) provides that Defendants shall not "call upon, solicit, contact, divert, take away, [or] do business with" any Champion customer for products or services sold by Champion in the relevant territory. But such limitation "shall not apply to Legacy

---

[2] The Court recognizes that Defendants have changed counsel since entering the TRO.

5

Accounts following the expiration of termination of the Term." Defendants claim they are "at least permitted to solicit Legacy Accounts" pursuant to these provisions. (Doc. 58 at 5).

This Court acknowledges that the TRO should not impose restrictions greater than those established in the Services Agreement. § 11(a)(iii) of the Services Agreement, moreover, clearly contemplates that Defendants would be permitted to solicit Legacy Customers following termination. But § 11(a)(i) prohibits Champion from engaging in the marketing or sale of "any products or services that are competitive with any products or services marketed and/or sold by any Champion Party" in the relevant territory and includes no exception for the Legacy Customers.

When interpreting the Services Agreement, it is this Court's "role [ ] to determine the intention as manifested not by what the parties say now they intended but by the document." *Press Mach. Corp. v. Smith R.P.M. Corp.*, 727 F.2d 781, 784 (8th Cir. 1984). Applying the plain language of the Services Agreement, the Court finds that a limited modification to § 1(i) of the TRO to permit Defendants to solicit and do certain business with the Legacy Customers is appropriate. Provided, however, that § 1(ii) of the TRO shall remain in full force effect and Defendants still may not engage in the marketing or sale of competitive products or services in the applicable territory. In short, Defendants can do business with the Legacy Customers but not as to any products or services which are competitive with Champion.

As discussed above, the parties' briefing addresses issues well beyond the scope of the limited relief requested in Defendants' motion. Particularly considering that Defendants consented to the TRO currently in place, the Court finds that this modification appropriately balances the factors outlined by the Eighth Circuit in *Dataphase Sys., Inc. v. C L Sys., Inc.* with the unique circumstances in this case. 640 F.2d 109, 114 (8th Cir. 1981). The parties will return to this Court on August 11, 2021, after which this Court will consider the broader issues posed by Champion's motion for a preliminary injunction.

Accordingly,

**IT IS HEREBY ORDERED** that Defendants' Motion for Modification of the Temporary Restraining Order (Doc. 58) is **GRANTED in part** and § 1(i) of the TRO is **HEREBY AMENDED** to state the following: "i. Soliciting Champion's customers and prospective customers, or employees, or interfering with or attempting to interfere with Champion's relationships with any of its customers and prospective customers, or employees. <u>Provided, this section shall not apply to any Legacy Customers identified in Exhibit C of the Services Agreement</u>."

Dated this 3rd day of August, 2021.

_____
JOHN A. ROSS
UNITED STATES DISTRICT JUDGE