**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | | |
|---|---|---|
| CHAMPION SALT, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 4:21-CV-00755-JAR |
| | ) | |
| MARK J. ARTHOFER, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**FINDINGS OF FACT, CONCLUSIONS OF LAW**
**AND PRELIMINARY INJUNCTION ORDER**

This matter is before the Court on Plaintiff Champion Salt, LLC's ("Champion") Motion for Preliminary Injunction. (Doc. 3). On June 22, 2021, Champion filed this action against Defendants Mark J. Arthofer ("Arthofer") and affiliated entities alleging breach of contract (Count I), violation of the Defend Trade Secrets Act ("DTSA") (Count II), violation of the Missouri Computer Tampering Act (Count III), and civil conspiracy (Count IV). (Doc. 1). The same day, Champion filed a Motion for Temporary Restraining Order ("TRO") and Preliminary Injunction. (Doc. 3). On June 25, 2021, this Court held a hearing on Champion's motion for TRO, and the parties proceeded to enter a TRO by consent. (Doc. 18). The consent TRO, which remains in effect, provides that Defendants may not "[s]olicit Champion's customers and prospective customers" or engage in the "sale of any products or services that are competitive" with Champion in certain states, among other restrictions. (*Id.* at § 1(i-ii)). The Court later granted in part Defendants' motion to amend the TRO. (Doc. 64).[1]

---

[1] Also fully briefed and pending before this Court is Champion's Motion for Contempt and to Enforce Temporary Restraining Order. (Doc. 22).

1

On July 23, 2021, the parties appeared before this Court for a hearing on Champion's motion for preliminary injunction. Because the parties could not complete the hearing that day, the Court continued the hearing until August 11, 2021 and found that good cause existed to continue the TRO in full force and effect. (Doc. 57). On both dates, Champion appeared by counsel Brian Kaveney and Ida Shafaie, while Defendants appeared in person and by counsel James Martin. Champion presented its case and adduced testimony from Lisa Myers ("Myers"), Champion's Chief Operating Officer and Chief Financial Officer. For Defendants, Arthofer himself testified, as did Defendants' long-term counsel in Iowa, Brian J. Kane ("Kane").

Following the hearing, the Court again found good cause to continue the TRO in full force and effect until it had an opportunity to consider the evidence and enter its written order. (Doc. 75). The parties have submitted proposed findings of fact and conclusions of law. (Docs. 84, 85). The Court has considered the arguments and evidence presented at the hearing and in the parties' briefing, as well as all affidavits and exhibits submitted on the record, including in connection with the TRO hearing. For the reasons stated herein, the Court will grant Champion's motion for preliminary injunction.

## **FINDINGS OF FACT**

1.   Champion supplies bulk de-icing salt to snow and ice management contractors, municipalities, and distributors. Champion supplies its salt by the ton via truckloads, barges, laker vessels and ocean vessels to customers throughout the Midwest. Champion contracts with terminals to store salt and permit designees to make deliveries from the terminals. (Doc. 1 at ¶¶ 11-12).

2.   Effective June 1, 2020, Champion, Arthofer, and Defendant Skyline Mixing and Sales,

LLC ("Skyline") executed a Services Agreement (the "Services Agreement") pursuant to which Skyline agreed to provide Sales Services and Mixing Services within a defined "Territory" including Kentucky, Tennessee, Kansas, Minnesota, Iowa, Missouri, Illinois, Michigan, Wisconsin, Indiana, and Ohio. (Doc. 1-3). All parties were represented by counsel when negotiating the Services Agreement. (*Id.* at § 17(l); Doc. 80 at 7-8).

3.     § 6 of the Services Agreement is titled "Term; Termination" and includes the following key provisions:

- <u>§ 6(a)</u>: The term of this Agreement (the "Term") shall commence on the date hereof and shall continue until May 31, 2025 unless earlier terminated in accordance with this Agreement. The Term shall automatically renew for successive one (1) year periods (with each such renewal being part of the Term) unless either party provides prior written notice to the other party that it does not wish to renew the Term at least ninety (90) days prior to the end of the then current Term.

- <u>§ 6(b)</u>: Subject to applicable law, Champion shall have the right to terminate the Term for good cause . . . . In the event that good cause exists, Champion may, in lieu of terminating this Agreement (but without limiting any other remedy of Champion), eliminate any or all of Skyline's rights to be the exclusive representative hereunder, thereby rendering any or all such rights non-exclusive, provided, however, that prior to the elimination of any exclusivity, Skyline shall have a period of thirty (30) days to cure (if capable of being cured) such alleged good cause after receipt of written notice alleging good cause from Champion, and if cured within such period of time, then Skyline's rights to be the exclusive representative hereunder shall continue in full force and effect.

- <u>§ 6(c)</u>: Subject to applicable law, Skyline shall have the right to terminate the Term for good cause. "Good cause," as used in this subsection (c), means (i) Champion breaches this Agreement, (ii) Champion experiences a Change of Control . . . . In the event of a termination of the Term in accordance with clause (ii) of this subsection, the restrictions in Section 11 shall terminate as of the effective date of such termination. Notwithstanding the foregoing, prior to terminating this Agreement pursuant to clause (i), Skyline shall have provided thirty (30) days prior written notice and, if capable of being cured, an opportunity to cure during such period.

4.     § 10 of the Services Agreement is titled "Confidentiality" and defines what constitutes "Confidential Information," establishes restrictions on use by the "Receiving Party," and provides for the return and/or destruction of any Confidential Information on request by the

3

"Disclosing Party." § 10(c) limits the Receiving Party to using confidential information "solely for the purpose of performing its obligations [under the Services Agreement] and for no other purpose."

5.   § 11 of the Services Agreement, titled "Non-Competition and Non-Solicitation," imposes restrictive covenants on Arthofer and Skyline "[i]n order to protect the Champion Parties' interests, including confidential or trade secret business information, relationships with clients, goodwill, and the investment in the engagement." Subject to § 6(c), the restrictive covenants apply during the Term and "for a period of two (2) years following the termination of the Term." Pursuant to § 11(d), however, Champion "agrees and acknowledges that in no event shall the non-competition, non-solicitation or other restrictive covenant provisions set forth in this Section 11 apply if the Agreement is terminated by Champion pursuant to Section 6(a) or terminated by Skyline pursuant to Section 6(c)." During such times that the restrictive covenants are in effect, Arthofer and Skyline may not:

- (i) engage in the marketing, distribution and/or sale of any products or services that are competitive with any products or services marketed and/or sold by any Champion Party anywhere in the Territory, provided that, if the Term is expires [sic] as a result of Champion providing a notice of non-renewal pursuant to Section 6(a) or Champion terminating the Term pursuant to Section 6(b)(ii), then this clause (i) shall not be interpreted as prohibiting the marketing, distribution and/or sale of salt mixing and/or treatment services after such expiration or termination;

- (ii) engage in the marketing, distribution and/or sale of bulk salt with any operating partner (including any vendor or salt supplier or producer) of any Champion Party or call upon, solicit, contact, divert, take away, do business with or attempt to call upon, solicit, contact, divert, take away or do business with any operating partner of any Champion Party;

- (iii) call upon, solicit, contact, divert, take away, do business with or attempt to call upon, solicit, contact, divert, take away or do business with any customer or prospective customer of any Champion Party for products or services marketed and/or sold, by any Champion Party in the Territory, provided that this clause (iii) shall not apply to Legacy Accounts following the expiration or termination of the Term; or

4

- • (iv) solicit, hire, recruit, divert, or take away from any Champion Party the services of any of the employees, contractors or agents of any Champion Party, or induce in any way any non-performance of any of the obligations of any such employees, contractors or agents to any Champion Party.

Per § 11(c), Skyline and Arthofer also may not "circumvent, avoid, bypass, or obviate any Champion Party, directly or indirectly, in any transaction or prospective business relationship about which [Skyline or Arthofer] learned during the Term."

6. § 17(h) of the Services Agreement is titled "Equitable Remedies" and provides that each party "agrees that money damages may not be a sufficient remedy for any breach of this Agreement and that the other party(ies) shall be entitled to seek injunctive or other equitable relief to remedy or prevent any breach or threatened breach of this Agreement."

7. § 17(r) of the Services Agreement establishes that the parties would "discuss by May 31, 2022, the possibility of Skyline or [Arthofer] becoming an equity owner in Champion." The section further states that there is "no guarantee that this equity ownership will be extended or obtained, but Skyline's performance [under the Services Agreement] shall be a consideration thereof."

8. The Services Agreement makes multiple references to "Legacy Customers" and "Legacy Accounts." Such customers were clients of Skyline prior to execution of the Services Agreement, and per § 10(a), all "Legacy Account information shall be considered the Confidential Information of Skyline." Additionally, the restrictive covenants in § 11(a)(iii) of the Services Agreement "shall not apply to Legacy Accounts following the expiration or termination of the Term."

9. Following execution of the Services Agreement, Arthofer and Skyline did call upon and interact with actual and potential Champion customers in performing their responsibilities.

10. Champion utilizes a customer relationship management ("CRM") tool called

5

PipeDrive. Champion stores sensitive information in PipeDrive, including customer contact information, order histories, notes regarding customer needs, contract details, and projected sales data. To allow Skyline employees to access PipeDrive, Champion created a "Midwest" user with such access and provided the login information to Skyline. (Doc. 4-14 at ¶ 12). Skyline employees, including Executive Assistant Calvin Koeller ("Koeller"), used the Midwest account to perform duties and service clients, though the Services Agreement does not explicitly discuss PipeDrive access.

11. At some point during the course of performance of the Services Agreement, the parties began experiencing challenges. In May 2021, Arthofer evaluated his ability to terminate the Services Agreement and end Skyline's relationship with Champion. On May 23, 2021, Arthofer informed his long-term legal counsel, Kane, that he was "looking to terminate the [Services Agreement] between Champion and Skyline." The following day, Kane responded by providing legal advice regarding termination options. Arthofer replied in part: "Basically, I am stuck with this agreement?" Kane responded that Arthofer was not stuck "if [he] can send a default notice and they don't cure." (Doc. 80 at 26-27).

12. On May 24, 2021, Koeller sent an e-mail indicating that Arthofer "told us we are done with Champion" and was "having his attorney write up the contract termination." (*Id.* at 29). Arthofer denies that he told Koeller that Skyline was done with Champion. (*Id.* at 29-30).

13. On May 21 and May 26, 2021, an individual using the Midwest user credential issued to Skyline took actions in PipeDrive which were registered in an audit log as "Downloaded exported Deals." On May 28, 2021, an individual using the same credentials took actions which were registered in the audit log as "Deleted deals." (Doc. 4-15 at 1). Champion learned of these actions on or about June 1, 2021. (Doc. 4-1 at ¶ 31).

14. Scott Sutter is the Vice President for Project Management at Investa Management,

6

which provides resources and services to Champion, including PipeDrive implementation. (Doc. 4-14 at ¶¶ 2-4). In a declaration before this Court, Scott Sutter has stated that he reviewed the PipeDrive audit log and determined that an individual using the Midwest user credentials "accessed and downloaded nearly all of Champion's PipeDrive database information pertaining to the Midwest Region," including customer contact and pricing information, and then on May 28, 2021 "attempted to delete hundreds of sets of contact information for potential customers." (*Id.* at ¶¶ 15-17).

15. In a declaration before this Court, Koeller has acknowledged that he "was the primary Skyline user of PipeDrive" but also claims that numerous Champion employees had access to the Midwest user account. (Doc. 58-2 at ¶¶ 10-12). Koeller states that he did not download and then attempt to delete the relevant customer information from PipeDrive. Instead, Koeller insists he was merely organizing data, specifically by converting lost or open bids from the 2020-2021 purchasing season into leads for the 2021-2022 season. (*Id.* at ¶¶ 16-23). Defendants put forth evidence at the preliminary injunction hearing suggesting that, per PipeDrive's website, such actions as described by Koeller could be misinterpreted as mass downloads and deletions.

16. In May and early June of 2021, Arthofer exchanged multiple communications with Gary Perlmuter ("Perlmuter"), Chief Executive Officer of Champion. These communications broadly and somewhat contradictorily included concerns regarding performance of the Services Agreement, negotiations of Arthofer's potential equity ownership in Champion, consideration of Arthofer as a potential replacement for Myers as Chief Operating Officer of the Midwest division, and eventually Arthofer's desire to terminate the Services Agreement. (Docs. 4-4 – 4-13, Doc. 80 at 22-25; Doc. 86 at 70).

17. On May 31, 2021, Arthofer proposed a meeting with Perlmuter to discuss potential

equity ownership and an officer position in Champion, stating: "[W]e have to put decision making into hyper speed to make Champion all that it can be. I am ready to rock this thing!! I hope you are?" (Doc. 4-4). Despite this apparent excitement, the follow-up e-mails demonstrate that the relationship between Skyline and Champion had become irreparably strained.

    a.  On Friday, June 4, 2021, Perlmuter indicated that he was "not sure it's a good idea for [Arthofer] to press for a call right now" because there was "some shock with the amount of past due [accounts receivable] and (more importantly) salt inventory left on the ground in the Midwest. There's a lot of inventory, and hence money, on the ground throughout the Midwest. They're not going to want to talk about buying more salt for the Midwest and identifying locations for salt sales until the inventory and [accounts receivable] issues are cleared up." (Doc. 4-5 at 1).

    b.  Approximately 20 minutes later, Arthofer responded in frustration stating "[a]s far as me and my contract with the experience I have had this past season it may be best if we part ways." Arthofer also represented that he would "let the sales team . . . know on Monday that [Champion] is exiting the Midwest seems to be the vibe I am getting." Finally, Arthofer requested that Perlmuter "[p]lease send my release to my contract" because he "will be moving on." (*Id.*).

    c.  Later that evening, following additional communications, Arthofer e-mailed multiple Champion representatives: "I feel as though Champion is exiting the Midwest so I would appreciate that my contract be terminated . . . . I will be proceedings with termination papers on Monday. I will let my sales team know that we will not be doing sales under the Champion name in 2021-22. Do know that I have been trying to work with Champion to come to some kind of resolution and to no avail has there been any attempt on Champion['s] part to remedy. Thanks for the experience I would like to say it has been a good one but it hasn't." (Doc. 4-6).

    18. On or about June 5, 2021, having received the above e-mails from Arthofer, Perlmuter contacted Investa Management and requested that it change the passwords for the e-mail addresses issued to Skyline and Arthofer, though the e-mail accounts remained active. (Doc. 4-1 at ¶¶ 31-32). Around the same time, Champion restricted Defendants' access to PipeDrive.

    19. On June 7, 2021, Myers sent two e-mails informing salt terminals that Defendants "were no longer associated with Champion." (Doc. 86 at 33-35). Myers testified that she discussed these communications with Perlmuter, and that she sent the e-mails in order to protect salt

inventory in light of Arthofer's June 4, 2021 communications indicating he planned to terminate the Services Agreement.

20. On June 9, 2021, Skyline's counsel sent a letter to Perlmuter regarding the Services Agreement. (Doc. 4-7). The letter expresses Skyline's position that the "actions of Champion to terminate the relationship established in the Services Agreement constitute a termination by Champion without good cause," and therefore "the restrictive covenants set forth in Section 11 of the Services Agreement . . . do not apply to Skyline or Mark Arthofer and are of no further force or effect." (*Id.* at 2). Perlmuter received this document on June 10, 2021 but did not respond. (Doc. 4-1 at ¶ 40).

21. Defendants contend that on June 17, 2021, Skyline's counsel sent a follow-up letter to Gary Perlmuter concerning the Services Agreement. The letter "again ask[s] for the immediate return of all information and contracts related to the Legacy Accounts" considering Champion had allegedly "terminated the Services Agreement with Skyline." (Doc. 38-3).

22. In June 2021, apparently believing Champion had unilaterally terminated without cause, Defendants began rapidly and aggressively pursuing bulk salt sales, including with existing Champion customers (albeit primarily Legacy Customers):

    a. On June 8, 2021, a Champion customer requested cancellation of an agreement executed May 4, 2021 for the purchase of approximately $800,000 in salt. The customer explained that it had been advised by Arthofer that Champion would not be able to fulfill the order. (Doc. 4 at 6-7; Doc. 4-1 at ¶ 35).

    b. On June 10, 2021, Arthofer sent an e-mail with the subject "salt pricing" and attached a spreadsheet of Champion's salt pricing at terminals throughout the United States. (Doc. 4 at 7; Doc. 4-8).

    c. On June 14, 2021, Koeller e-mailed Arthofer and indicated that a Champion customer had called seeking to diversify its suppliers. Koeller suggested supplying the customer with salt. (Doc. 4 at 7; Doc. 4-9).

d. On June 15, 2021, Koeller e-mailed Skyline employees a template letter that Legacy Customers could send to Gary Perlmuter in order to terminate their relationship with Champion and transfer such relationship to Skyline. (Doc. 4 at 7; Doc. 4-10).

e. On June 16, 2021, Arthofer told his team: "I need to acquire as many sales contracts as we possibly can." (Doc. 4-12). The same day, Koeller sent an e-mail proudly announcing the creation of Skyline Salt Solutions, which "has separated from Champion" and would "provide the same great services, with expanded products." (Doc. 4 at 7; Doc. 4-13).

f. On June 18, 2021, Koeller e-mailed salt pricing to a Champion customer and asked if the customer preferred to "redo the contracts through Skyline." (Doc. 4-1 at ¶ 49).

23.   There is currently pending before this Court Champion's Motion for Contempt and to Enforce Temporary Restraining Order. (Doc. 22). In the motion, Champion alleges that Defendants fulfilled a salt delivery for Arconic Davenport LLC ("LLC") in violation of the TRO. (Doc. 23). Defendants respond that the delivery was an oversight and had been arranged prior to issuance of the TRO. This Court deferred consideration of Champion's motion after concluding that it appears "Defendants may have violated the strict language of the TRO, but [ ] any violation was not in bad faith and can be remedied by money damages." (Doc. 42 at 3). At the July 23, 2021 preliminary injunction hearing, Myers testified that an Arconic employee informed her that Arconic made payments for these deliveries to Defendants, who then failed to direct the funds to Champion. On cross-examination, Myers admitted that the payments were actually rejected by Defendants, as confirmed by Arthofer on direct examination. (Doc. 86 at 11, 69).

## CONCLUSIONS OF LAW

24. In deciding whether to grant or deny a motion for preliminary injunction, the Court must consider four factors: (1) the likelihood the moving party will succeed on the merits; (2) the threat of irreparable harm to the movant; (3) the balance between this harm and the injury that granting the injunction will inflict; and (4) the public interest. *Dataphase Sys., Inc. v. C.L. Sys., Inc.*, 640 F.2d 109, 113 (8th Cir. 1981). The inquiry is "whether the balance of equities so favors

10

the movant that justice requires the court to intervene to preserve the status quo until the merits are determined." *Id.* Since *Dataphase*, the Eighth Circuit has generally held that the likelihood of success on the merits is the most significant factor. *See Barrett v. Claycomb*, 705 F.3d 315, 320 (8th Cir. 2013). Still, "[n]one of these factors is by itself determinative," and "in each case the four factors must be balanced to determine whether they tilt toward or away from granting injunctive relief." *West Pub. Co. v. Mead Data Cent., Inc.*, 799 F.2d 1219, 1222 (8th Cir. 1986). The moving party bears the burden to establish the need for a preliminary injunction. *Chlorine Inst., Inc. v. Soo Line R.R.*, 792 F.3d 903, 014 (8th Cir. 2015).

25. Based on the entire record, this Court concludes that Champion has carried its burden of establishing that preliminary injunctive relief is warranted.

**A.   Likelihood of Success on the Merits**

Unclean Hands

26. Defendants contend that Myers "inexcusably attempted to mislead the Court" regarding the Arconic payments and, accordingly, Champion cannot recover pursuant to the doctrine of unclean hands. (Doc. 85 at 11-14).

27. "No rigid formula exists for the Court to apply the doctrine of unclean hands. It requires the free and just exercise of discretion." *Dream Team Collectibles, Inc. v. NBA Props., Inc.*, 958 F. Supp. 1401, 1418 (E.D. Mo. 1997) (citing *Johnson v. Yellow Cab Co.*, 321 U.S. 383, 387 (1944)). The "guiding doctrine" provides that "he who comes into equity must come with clean hands," and parties seeking to recover "shall have acted fairly and without fraud or deceit *as to the controversy in issue*." *Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co.*, 324 U.S. 806, 814-15 (1945) (citations and internal quotations omitted) (emphasis added). To dismiss a claim on grounds of unclean hands, courts in this district typically require a "substantial nexus" between

11

the claim and the action establishing unclean hands. *See Nestle Purina Petcare Co. v. The Blue Buffalo Co. Ltd.*, No. 4:14-CV-859 RWS, 2016 WL 4272241, at *3-4 (E.D. Mo. Aug. 12, 2016) (citing *Shaver v. Heller & Merz Co.*, 108 F. 821, 834 (8th Cir. 1901)).

28. In its discretion, this Court finds that Myers' testimony, though somewhat misleading, does not preclude Champion from obtaining a preliminary injunction. Myers' statements concerning the Arconic payment are far more relevant to Champion's pending motion for contempt than the larger issues in this litigation. Myers did not outright lie to the Court, though she certainly insinuated that Defendants accepted payment for a Champion delivery. The testimony is essentially immaterial to this motion, however, considering Defendants (i) have admitted that they solicited other Champion customers throughout June 2021 and (ii) promptly impeached Myers' credibility and clarified the rejection of the Arconic payment on cross-examination and through Arthofer's testimony. Defendants have not cited any precedent where a court has denied equitable relief purely because a plaintiff's witness offered misleading testimony on such a minor matter.

29. The Court advises both parties to proceed with caution when lobbing allegations of unclean hands or abuse of process. While testifying on critical matters concerning the events surrounding the alleged termination of the Services Agreement, both Kane and Arthofer made statements which were squarely contradicted by e-mail evidence. Kane insisted that "Mr. Arthofer has never asked [him] how to get out of the Services Agreement." (Doc. 86 at 61). Arthofer backed up this story, claiming that prior to June 4, 2021 he "did not confer [with his counsel] to terminate" the Services Agreement. Yet Arthofer e-mailed Kane on May 23, 2021: "I am looking to terminate the [Services Agreement]," and Kane responded with advice regarding termination options. (Doc. 80 at 25-26). Arthofer then insisted he did not inform Skyline employees that he was done with Champion Salt. Yet Koeller sent an e-mail on May 24, 2021 stating: "Mark told us we are done

12

with Champion." (*Id*. 28-29). These misrepresentations go to more central issues than Myers'
testimony concerning the Arconic payment.

Adequacy of Champion's Evidence

30. Defendants argue that Champion has not put forth sufficient evidence to justify

injunctive relief. At the preliminary injunction hearing, Champion only adduced testimony from

Myers but otherwise relied on its filings, including affidavits from relevant parties. While the Court

may have preferred that Champion present additional witnesses to substantiate its case, the Court

finds that there is sufficient evidence to grant the preliminary injunction. Many of the key facts are

undisputed, and much of this case turns on the Court's interpretation of the Services Agreement.

The Eighth Circuit has confirmed that district courts may receive and consider affidavits on a

motion for preliminary injunction. *See Wounded Knee Legal Def. Fund / Offense Comm. v. Fed.

Bureau of Investigation*, 507 F.2d 1281, 1286-87 (8th Cir. 1974); *see also Movie Sys., Inc. v. MAD

Minneapolis Audio Distribs.*, 717 F.2d 427, 432 (8th Cir. 1983).

Breach of Contract (Count I)

31. Under Missouri law, a claim for breach of contract requires "(1) the existence and terms

of a contract; (2) that plaintiff performed or tendered performance pursuant to the contract; (3)

breach of the contract by defendants; and (4) damages suffered by the plaintiff." *Keveney v.

Missouri Mil. Acad.*, 304 SW.3d 98, 104 (Mo. banc 2010). Both sides agree, either implicitly or

explicitly, that the parties voluntarily executed the Services Agreement and that the restrictive

covenants in the agreement are generally valid and enforceable (except as to the Legacy

Customers, according to Defendants). Champion contends that Defendants have violated the

restrictive covenants, which remain in effect. Defendants argue that the restrictive covenants are

of no further force and effect because Champion prematurely repudiated the contract.

32. First, the Court finds that the restrictive covenants are "no more restrictive than necessary to protect [Champion's] legitimate interests" because they are reasonably limited in time (two years following termination) and scope (competitive services and interacting with former customers in the Territory) and therefore enforceable under Missouri law. *See Whelan Sec. Co. v. Kennebrew*, 379 S.W.3d 835, 841 (Mo. banc 2012). The Missouri Supreme Court has held that non-competition agreements are enforceable "only to the extent that the restrictions protect the employer's trade secrets or customer contacts." *Healthcare Servs. of the Ozarks, Inc. v. Copeland*, 198 S.W.3d 604, 610 (Mo. banc 2006) (citations omitted). Defendants do not dispute that they had substantial access to Champion's proprietary information through PipeDrive and other systems and formed meaningful customer relationships while acting as Champion's representative. Missouri courts have also consistently affirmed the reasonableness of two-year terms for restrictive covenants. *See Alltype Fire Prot. Co. v. Mayfield*, 88 S.W.3d 120, 123 (Mo. Ct. App. 2002) (citation omitted) ("The term of two years, furthermore, is supported by the overwhelming weight of case authority.").

Defendants argue that the restrictive covenants are unenforceable as to the Legacy Customers because Champion does not have a legitimate interest in protecting information regarding the Legacy Customers. Under the Services Agreement, "Legacy Account information shall be considered the Confidential Information of Skyline," and following termination, "Champion shall have no further rights to use the Legacy Account information." (Doc. 1-3 at § 10(a)). This does not mean, however, that Champion lacks any protectable interest as it relates to the Legacy Customers. Defendants do not deny that they had access to Champion's pricing information and other key details of Champion's strategy during the year in which they performed under the Services Agreement. The Court also notes that, pursuant to § 11(a)(iii) and as reflected in this Court's modification of the TRO, the parties established more limited restrictive covenants

as to the Legacy Customers following termination. Defendants can solicit Legacy Customers following termination per § 11(a)(iii) but may not offer any services competitive with Champion in the Territory per § 11(a)(i). Sophisticated parties represented by counsel negotiated these provisions, and the Court finds that this is a reasonable, enforceable restrictive covenant considering the unique status of the Legacy Customers. Therefore, the Court determines that the restrictive covenants found in § 11 of the Services Agreement are enforceable under Missouri law.

33. Second, the Court finds that Champion is likely to succeed on its claim that Defendants breached the Services Agreement by using Champion's confidential information to offer competitive services in June 2021. Pursuant to § 10(c) of the Services Agreement, Arthofer and Skyline agreed that Champion's confidential information "shall be used . . . solely for the purpose of performing [Skyline and Arthofer's] obligations hereunder and for no other purpose." Confidential information is explicitly defined in § 10(a) to include "bid analyses and information, customer contracts and analysis, costs, [and] pricing" as well as Champion's "rates, terms and proposals for river terminals, and bulk salt customers and their tonnages," among other information. These provisions unquestionably "by their terms or by their nature would be reasonably interpreted as surviving the expiration or termination of the Term" and therefore "shall survive the expiration or termination of the Term." (Doc. 1-3 at § 6(d)). Regardless of whether Champion terminated the Services Agreement as alleged by Defendants, the use of Champion's confidential pricing information as reflected in the June 2021 e-mails constitutes a clear breach of the Services Agreement's confidentiality provisions.

Defendants contend that confidential information concerning the Legacy Customers actually belongs to Arthofer and Skyline, and therefore Champion has no legitimate interest in protecting this information. (Doc. 85 at 19-20). But the record reflects that Defendants took and

15

attempted to use Champion's entire pricing spreadsheet. (Doc. 4-8). Therefore, the Court finds that Champion is likely to succeed on the merits of its breach of contract claim.

34. Second, the Court finds that the restrictive covenants found in § 11 of the Services Agreement remain in full force and effect, and Champion is likely to succeed on its claim that Defendants have breached these provisions. § 11(a) specifically provides that the restrictive covenants shall apply "during the Term and, subject to Section 6(c), for a period of two years following the termination of the Term." This Court has identified two provisions in the contract discussing particular circumstances where certain restrictive covenants shall no longer apply. Defendants have not identified any other relevant provisions.

- § 11(a)(i) states that "if the Term [ ] expires as a result of Champion providing a notice of non-renewal pursuant to Section 6(a) or Champion terminating the Term pursuant to Section 6(b)(ii), then this clause (i) shall not be interpreted as prohibiting the marketing, distribution and/or sale of salt mixing and/or treatment services after such expiration or termination."

- § 11(d) states that "in no event shall the non-competition, non-solicitation or other restrictive covenant provisions set forth in this Section 11 apply if the Agreement is terminated by Champion pursuant to Section 6(a) or terminated by Skyline pursuant to Section 6(c)."

Champion has not terminated the Services Agreement pursuant to § 6(a), which discusses non-renewal after the initial five-year term. Champion has also not terminated pursuant to § 6(b)(ii), which provides that a change of control of Skyline establishes good cause for termination. Finally, Skyline has not terminated the Services Agreement for cause pursuant to § 6(c), especially considering Skyline has not provided formal notice of termination or an opportunity to cure. The Services Agreement identifies means of termination by which the restrictive covenants (or a portion thereof) will no longer apply, yet the clear facts reveal that such provisions were not triggered by Champion's actions.

16

Defendants offer a clear and potentially accurate version of events. On Friday, June 4, 2021, Arthofer expressed his intent to terminate the Services Agreement the following Monday. The Court agrees with Defendants that Arthofer's statements "all reflect taking an action in the future – it may have been the near future, but it was in the future." (Doc. 85 at 17). According to Defendants, Champion then anticipatorily repudiated the Services Agreement by terminating Defendants' PipeDrive access and informing terminals that Champion was no longer affiliated with Skyline. These actions supposedly rendered Defendants unable to perform their duties under the Services Agreement, though Champion disputes this fact, especially considering the Services Agreement does not mention PipeDrive or salt terminal access. Only for purposes of this motion for preliminary injunction, this Court will accept Defendants' claim that Champion breached the Services Agreement after receiving Arthofer's June 4, 2021 e-mail. It seems likely that Champion quickly terminated Defendants' access in order to protect its salt inventory, even if the Services Agreement had not yet been formally terminated. The Court believes that Arthofer's final June 4, 2021 e-mail in particular demonstrates a clear intent to fully terminate the Services Agreement, and any claim that Arthofer was only requesting a release from his obligations is uncredible. (Doc. 4-6).

Even if Champion moved prematurely by cutting off Defendants' access to PipeDrive and the terminals, Arthofer responded prematurely by soliciting Champion customers rather than providing notice and an opportunity to cure the breach (as his counsel had previously suggested). Critically, Champion's supposed breach of the Services Agreement does not nullify the restrictive covenants. Under § 11(d) of the Services Agreement, the restrictive covenants cease applying if Skyline terminates for cause pursuant to § 6(c), and a breach by Champion constitutes good cause. Prior to terminating for cause, however, Skyline had an obligation to provide 30 days' written notice and an opportunity to cure. Defendants have not at any point suggested that Skyline

17

provided such notice or an opportunity to cure. It appears to this Court that both parties moved too quickly and without meaningful consideration of the Services Agreement in the midst of a fast-moving business dispute. At best, Defendants may establish that the parties mutually terminated the Services Agreement, but that would leave the § 11 restrictive covenants in effect for another two years.

The Court notes, moreover, that the alleged breaches were extremely curable because Champion could have easily restored PipeDrive access and retracted its communications to the salt terminals. The purpose of a notice and cure provision is precisely to avoid a scenario like this one. Courts have repeatedly held that while failure to provide notice and an opportunity to cure does not typically preclude seeking damages, it is a "common prerequisite[] to the termination of an agreement."). *Ariens Co. v. Woods Equip. Co.*, No. 05-C-139, 2006 WL 2597979, at *4 (E.D. Wis. Sept.9, 2006) (citation omitted); *see also G&K Servs., Co. v. Bill's Super Foods, Inc.*, No. 3:08-CV-48 SWW, 2009 WL 2982971, at *20 (E.D. Ark. Sept. 15, 2009) (collecting cases). In short, the plain language of Services Agreement identifies particular scenarios pursuant to which the restrictive covenants become void, and Defendants have not alleged that those scenarios occurred.

The Court recognizes that Missouri has adopted the "first to breach rule," under which "a party to a contract cannot claim its benefit where he is the first to violate it." *Randy Kinder Excavating, Inc. v. J.A. Manning Constr. Co., Inc.*, 899 F.3d 511, 517 (8th Cir. 2018) (quoting *Barnett v. Davis*, 335 S.W.3d 110, 112 (Mo. Ct. App. 2011)). Defendants do not discuss this rule. Where contracts include a right to cure breaches, however, courts applying the "first to breach" rule have consistently held that the non-breaching party must first provide notice and opportunity to cure before being relieved of its obligations. *See Milton Reg'l Sewer Auth. v. Travelers Cas. Surety Co. of Am.*, 648 F. App'x 215, 217 (3d Cir. 2016) (Holding first to breach rule "gives way to a more specific one if the contract includes an express provision granting the breaching party

18

the opportunity to cure before the contract is terminated."); *Matrix Grp. Ltd., Inc. v. Rawling Sporting Goods, Co., Inc.*, No. 4:04-CV-126 ERW, 2005 WL 8176878, at *5 (E.D. Mo. Apr. 13, 2005) (applying Delaware law) ("Because the Court has found the notice and cure provision to be unambiguous and because there is no dispute that Rawlings failed to provide the opportunity for cure clearly set forth in the Agreement, the court finds that Rawling's purported termination of the Agreement was ineffective."). The Services Agreement includes an unambiguous provision explaining the circumstances under which Skyline and Arthofer could be relieved of the restrictive covenants in § 11 in the event of breach by Champion. Because the requirements of this provision – notice and opportunity to cure – were not fulfilled, it appears that § 11 remains effective and Champion is likely to succeed on the merits of its breach of contract claim. For purposes of clarity, the Court agrees with Defendants that at this point the Services Agreement has been effectively terminated.

Defend Trade Secrets Act (Count II)[2]

35. The DTSA creates a cause of action for the "owner of a trade secret that is misappropriated . . . if the trade secret is related to a product or service used in, or intended for use in, interstate or foreign commerce." 18 U.S.C. § 1836(b)(1). This Court has held that to prevail on a claim for misappropriation of a trade secret, the plaintiff must show (1) the existence of a protectable trade secret; (2) misappropriate of those trade secrets by the defendant; and (3) damages. *Phyllis Schlafly Revocable Tr. v. Cori*, 512 F. Supp. 3d 916, 931 (E.D. Mo. 2021). A misappropriation occurs when a person who has acquired or derived knowledge of a trade secret uses it without the owner's consent, among other potential means. *Id.* at 932 (citations omitted).

---

[2] Because Champion does not discuss Counts III and IV in its Proposed Findings of Fact and Conclusions of Law (Doc. 84), this Court declines to consider whether Champion is likely to succeed on the merits of those claims.

36. For the same reasons discussed above regarding Champion's confidential pricing information, this Court finds that Champion is likely to succeed on its DTSA claim. E-mail evidence in the record shows that on June 10, 2021, after Champion's alleged anticipatory repudiation, Arthofer sent a spreadsheet containing Champion's salt pricing across numerous terminals. Given Defendants' clear position that the Services Agreement had already been terminated at this juncture, as evidenced by Kane's June 9, 2021 letter, there is no plausible argument that Arthofer sent this e-mail in the course of providing services under the agreement. The pricing information is clearly a protectable trade secret which Arthofer appears to have utilized in violation of the Services Agreement in order to solicit Champion customers.

37. As to the dispute over PipeDrive, the Court cannot say at this juncture that Champion is likely to succeed on its claim that Defendants violated the DTSA by downloading and deleting information from PipeDrive. The parties have offered somewhat contradictory affidavits from Scott Sutter and Koeller, neither of whom testified at the preliminary injunction hearing. (Doc. 4-14; Doc. 58-2). Simply put, this Court cannot determine whether Koeller was nefariously downloading and deleting data as alleged by Champion or merely organizing data in accordance with his job duties. *See Wounded Knee Legal Defense*, 507 F.2d at 1287 (citation omitted) ("[W]here the affidavits relate to controverted factual issues . . . [t]he court should insist, as it did here, on the presentation of oral testimony which may be subjected to the test of cross-examination.").

**B.  Threat of Irreparable Harm**

38. Champion has demonstrated that it will suffer irreparable harm if this Court does not grant a preliminary injunction. Irreparable harm occurs when a party has no adequate remedy at law, typically because its injuries cannot be fully compensated through an award of damages. *Gen.*

20

*Motors Corp. v. Harry Brown's, LLC*, 563 F.3d 312, 319 (8th Cir. 2009). Courts regularly find irreparable harm where a non-compete agreement states that its breach constitutes irreparable injury. *See, e.g., Church Mut. Ins. Co. v. Sands*, No. 14-CV-3119-S-DGK, 2014 WL 3907831, at *3 (W.D. Mo. Aug. 11, 2014) (Holding that the breach of the non-compete agreement "per se supports an inference of irreparable harm especially since [defendant] consented in his non-compete agreement to an injunction against him in the event of breach"). The Services Agreement specifically states that "money damages may not be a sufficient remedy for any breach of this Agreement" and that the parties "shall be entitled to seek injunctive or other equitable relief." (Doc. 1-3 at § 17(h)).

39. The Court finds that Champion's remedy at law is inadequate because damages for Skyline and Arthofer's violations of the binding non-competition and non-solicitation provisions would be difficult if not impossible to measure. *Baker Elec. Co-op., Inc. v. Chaske*, 28 F.3d 1466, 1473 (8th Cir. 1994); *Systematic Bus. Servs., Inc. v. Bratten*, 162 S.W.3d 41, 51 (Mo. Ct. App. 2005). Courts in the Eighth Circuit routinely recognize a threat of irreparable harm in similar circumstances. *See H&R Block Tax Servs., LLC v. Haworth*, No. 4:15-CV-211, 2015 WL 5601940, at *4 (W.D. Mo. Sept. 22, 2015) ("Defendant is competing against Plaintiff for its current and prospective clients. Monetary relief will not adequately protect Plaintiff's interest in these relationships, and it cannot fully remedy Plaintiff's loss of good will, confidential information and other legitimate business advantage.").

40. Defendants contend that Champion has failed to submit evidence of irreparable harm, and money damages are sufficient to compensate for any potential damages. If Champion were solely claiming that it risked losing customers and associated profits, injunctive relief would not necessarily be merited. *See MPAY Inc. v. Erie Custom Comput. Applications, Inc.*, 970 F.3d 1010, 1020 (8th Cir. 2020) ("[I]t appears that any harm [plaintiff] may suffer in the form of lost customers

and lost profits is quantifiable and compensable with money damages."). But Champion is not merely alleging the potential loss of customers. Instead, Defendants have access to all of Champion's pricing information and have demonstrated an intent to use such information. In June 2021, Defendants aggressively targeted Champion customers while using Champion's confidential pricing information. Defendants have also jeopardized Champion's goodwill with customers, as e-mail records indicate that Arthofer informed a customer that Champion would not be able to supply salt for a substantial order.

Courts have consistently held that potential misuse of confidential information, such as customer information and business strategy, along with loss of goodwill, constitute irreparable harm. *See United Healthcare Ins. Co. v. AdvancePCS*, 316 F.3d 737, 741 (8th Cir. 2002) ("Loss of intangible assets such as reputation and goodwill can constitute irreparable injury."); *Perficient Inc. v. Gupta*, No. 4:21-CV-759 HEA, 2021 WL 2805282, at *3 (E.D. Mo. July 6, 2021) (citation omitted) ("Courts generally hold that the disclosure of confidential information such as customer information and business strategy will result in irreparable harm to the plaintiff."); *Express Scripts, Inc. v. Lavin*, 2017 WL 2903205, at *8 (E.D. Mo. July 7, 2017) ("Irreparable harm is also properly presumed where there is evidence that a covenant not to compete is breached or confidential, proprietary information is being improperly used."). For these reasons, there is sufficient likelihood of irreparable harm to justify imposition of a preliminary injunction.

## C. **Balance of Harms**

41. The balance between Champion's risk of irreparable harm and the injury inflicted by granting the preliminary injunction clearly favors granting injunctive relief. Champion has persuaded the Court that Defendants possess information that could be used to cause irreparable harm to Champion in the form of lost customers, contracts, goodwill, and a diminished competitive

position. Defendants' aggressive attempts to engage Champion customers in June 2021 demonstrate the extent of harm Champion will suffer absent a preliminary injunction.

42. As to the risk of harm to Defendants, the Court notes that Defendants are sophisticated parties who were represented by counsel when they executed the Services Agreement, which both recognizes the potential propriety of injunctive relief and imposes extensive restrictive covenants for two years following the term of the agreement. Skyline and Arthofer accepted substantial benefits in exchange for their relationship with Champion and should not be relieved of such obligations. *See Emerson Elec. Co. v. Rogers*, 418 F.3d 841, 846 (8th Cir. 2005) ("[Defendant] knowingly and voluntarily agreed to be restricted by the covenant, and any perceived harm to him by the enforcement of the agreement is outweighed by the harm foreseeable to [Plaintiff]."). Ultimately, the harms to Defendants are self-inflicted. *Sierra Club v. U.S. Army Corps of Eng'rs*, 645 F.3d 978, 997 (8th Cir. 2011) (balance of harm weighs in plaintiff's favor where injury to defendant was "largely self-inflicted").

43. The Court also recognizes that Defendants engage in other businesses which are not related to salt sales and treatment and accordingly will not be prohibited under the preliminary injunction. Defendants may also offer services outside the Territory covered by the Services Agreement and to Legacy Customers (with some limitations). The Court disagrees with Defendants' assertion that a preliminary injunction would completely shut down their business. Therefore, Defendants have additional opportunities to earn income during the course of this litigation.

44. The Court concludes that the harm Champion has suffered and will continue to suffer absent a preliminary injunction outweighs any potential harm to Defendants.

**D. Public Interest**

45. The public interest favors Champion because Missouri courts have consistently held

that the enforcement of reasonable restrictive covenants serves the public interest. *See Schott v. Beussnik*, 950 S.W.2d 621, 625 (Mo. Ct. App. 1997); *see also Haines v. VeriMed Healthcare Network, LLC*, 613 F. Supp. 2d 1133, 1137 (E.D. Mo. 2009) (citation omitted) ("The recognized benefits of reasonably enforced restrictive covenants are now beyond question."). More generally, Missouri courts recognize the public interest in enforcing all contracts. *See Home Shopping Club, Inc. v. Roberts Broad. Co.*, 989 S.W.2d 174, 179 (Mo. Ct. App. 1998) (citation omitted) ("It is in the public interest to enforce contractual rights and obligations."); *see also H&R Block Tax Servs., LLC v. Cardenas*, No. 4:20-CV-00109-SRB, 2020 WL 1031033, at *4 (W.D. Mo. Mar. 3, 2020)

46. The Court recognizes, however, that the public interest is not substantially implicated by this contract dispute between private litigants. *See Caballo Coal Co. v. Indiana Michigan Power Co.*, No. 4:01-CV-1558 CAS, 2002 WL 32727070, at *8 (E.D. Mo. Jan. 10, 2002) (citation omitted) ("[T]his is largely a dispute among private litigants and therefore, the public interest is not a significant factor in favor of one party or the other.").

## <u>CONCLUSION</u>

47. Sophisticated parties represented by counsel voluntarily executed the Services Agreement. The agreement includes reasonable restrictive covenants which are enforceable under Missouri law given their limited time and scope, especially considering Defendants' substantial access to Champion's confidential information and customer contacts. The plain language of the Services Agreement identifies particular circumstances where – because Champion has chosen not to renew the agreement or Skyline has terminated for cause – the restrictive covenants no longer apply. Because neither of those events occurred, the restrictive covenants remain in effect.

Besides the alleged downloading and deletion of the PipeDrive data, there are not meaningful factual disputes on this motion for preliminary injunction. The Services Agreement

and various e-mails speak for themselves. A business relationship soured, and it appears that both parties moved quickly to protect their own interests without carefully considering the particular language of their contract. Defendants do not deny soliciting Champion customers before they had received any formal notice of termination or release from the restrictive covenants in the Services Agreement. Defendants also do not deny using Champion's pricing information or directing customers, albeit mostly Legacy Customers, to transition their accounts to Skyline. In these circumstances, Champion has demonstrated a likelihood of success on the merits of its breach of contract and DTSA claims, that it will suffer irreparable harm absent injunctive relief, and that the balance of harms substantially favors granting its motion for a preliminary injunction. For these reasons, the Court finds and concludes that the *Dataphase* factors have been

met with respect to Champion's motion for a preliminary injunction.

Accordingly,

**IT IS HEREBY ORDERED** that Plaintiff Champion Salt, LLC's Motion for Preliminary Injunction (Doc. 3) is **GRANTED**. Defendants and their agents, and all other persons who are in active concert with them, are **HEREBY PRELIMINARILY ENJOINED** until further Order of this Court from directly or indirectly:

i. Soliciting Champion's customers and prospective customers, or employees, or interfering with or attempting to interfere with Champion's relationships with any of its customers and prospective customers, or employees. Provided, this section shall not apply to any Legacy Customers identified in Exhibit C of the Services Agreement.

ii. Engaging in the marketing, distribution and/or sale of any products or services that are competitive with any products or services marketed and/or sold by Champion in the states of Kentucky, Tennessee, Kansas, Minnesota, Iowa, Missouri, Illinois, Michigan, Wisconsin, Indiana, and Ohio.

iii. Possessing, using, or disclosing confidential or trade secret information including but not limited to: Champion's strategy, business plans, methods or policies, systems, documentation, research or development projects, trade secrets, any

names and addresses of customers, customer lists, or any other data relating to past, present, or prospective customers, and any other proprietary or Confidential Information as defined by the Services Agreement, including any Confidential Information contained in or repurposed in any medium.

iv.   Engaging in any action that tends to disparage, dilute the value of, or reflect negatively on Champion or its products or services.

**IT IS FURTHER ORDERED** that the bond previously posted remains in full force and effect.

Dated this 7th day of September, 2021.

_____
JOHN A. ROSS
UNITED STATES DISTRICT JUDGE